**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Maura D. Corrigan

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED JULY 30, 2004**

ESTATE OF BETTY JEAN SHINHOLSTER,
Deceased, by JOHNNIE E. SHINHOLSTER,
Personal Representative,

    Plaintiff-Appellee,

v                              No. 123720

ANNAPOLIS HOSPITAL, assumed name for
OAKWOOD UNITED HOSPITALS, INC.,

    Defendant-Appellant,

and

DENNIS ADAMS, M.D. AND MARY ELLAN
FLAHERTY, M.D.,

    Defendants.

_____

ESTATE OF BETTY JEAN SHINHOLSTER,
Deceased, by JOHNNIE E. SHINHOLSTER,
Personal Representative,

    Plaintiff-Appellee,

v                              No. 123721

KATHERINE ADAMS, Personal Representative
Of the Estate of DENNIS ADAMS, M.D., and
MARY ELLEN FLAHERTY, M.D.,

    Defendants-Appellants,

and

ANNAPOLIS HOSPITAL, assumed name for
OAKWOOD UNITED HOSPITALS, INC.,

    Defendant.
_____

BEFORE THE ENTIRE BENCH

MARKMAN, J.

We granted leave to appeal to consider the following three issues: (1) whether, and to what extent, MCL 600.6304 permits a trier of fact in a medical malpractice action to consider the plaintiff's own pre-treatment negligence to offset, at least in part, the defendant's fault; (2) whether the medical malpractice noneconomic damages cap of MCL 600.1483 applies to a wrongful death action based on an underlying claim of medical malpractice, and assuming such cap applies, whether an action filed under the wrongful death act is subject to the higher medical malpractice noneconomic damages cap of § 1483; and (3) whether, and to what extent, MCL 600.6311 applies in a wrongful death action. Regarding the first issue, the Court of Appeals affirmed the trial court's decision that MCL 600.6304(1) did not permit the trier of fact to offset defendants' fault on the basis of plaintiff's alleged pre-treatment

negligence.[1]   On the basis of the clear and unambiguous language of § 6304(1), we hold that a trier of fact is permitted in "personal injury, property damage, [and] wrongful death" tort actions, which necessarily include medical malpractice actions, to consider a plaintiff's pre-treatment negligence in offsetting a defendant's fault where reasonable minds could differ with regard to whether such negligence constituted "a proximate cause"—a foreseeable, natural and probable consequence—of the plaintiff's injury and damages.   Further, on basis of the evidence presented, we believe that reasonable minds could find that plaintiff's pre-treatment negligence in this case—her failing to regularly take her prescribed blood pressure medication during the year preceding her fatal stroke—constituted a foreseeable, natural, and probable consequence of her fatal stroke, and thus we remand this case to the trial court for proceedings consistent with the opinions of this Court.

Regarding the second issue, the Court of Appeals affirmed the trial court's decision that the higher medical malpractice noneconomic damages cap of § 1483 applies to a wrongful death action.   Consistent with our recent decision

---

[1] 255 Mich App 339, 352-354; 660 NW2d 361 (2003).

3

in *Jenkins v Patel*, 471 Mich ___, ___; ___ NW2d ___ (2004), in which we held that the medical malpractice noneconomic damages cap of MCL 600.1483 applies to a wrongful death action based on an underlying claim of medical malpractice, we affirm the decisions of both lower courts and hold that the higher medical malpractice noneconomic damages cap of § 1483 applies where the injured person, at any time before his death and as a result of a defendant's negligent conduct, fits within the ambit of MCL 600.1483(1)(a), (b), or (c).

Regarding the third issue, the Court of Appeals, finding that MCL 600.6311 applies in this case because both the personal representative and the decedent were or would have been sixty years of age or older at the time of judgment, affirmed the trial court's decision that plaintiff's award of future damages should not be reduced to present value. Because the term "plaintiff," as used in § 6311, refers, for purposes of a wrongful death action, to the decedent, and because Mrs. Shinholster, the decedent, was sixty-one at her death and at the time of judgment, we agree with the trial court's interpretation of § 6311, and hold that, on remand, the trial court cannot reduce any future damages awarded to plaintiff to their present value.

## I. BACKGROUND

In this medical malpractice action, Betty Shinholster (Shinholster), the decedent, made four visits to defendant Annapolis Hospital in April 1995, complaining of dizziness. Defendant Dr. Dennis Adams (Adams)[2] examined plaintiff on April 7 and April 10, and defendant Dr. Mary Ellen Flaherty (Flaherty) examined Shinholster on April 14. Shinholster's fourth visit on April 16 was precipitated by a massive stroke, after which she entered a coma for several months and died at the age of sixty-one. On behalf of his deceased wife, Johnnie Shinholster filed suit against Adams, Flaherty, and Annapolis Hospital, alleging that they had negligently treated his wife on April 10 and April 14 by failing to recognize that she had been experiencing transient ischemic attacks, or "mini-strokes" that often precede a full-blown, serious stroke.

The jury found in plaintiff's favor and awarded the following damages: (1) $220,000 for past economic damages; (2) $564,600 for past noneconomic damages; (3) $9,700 each year in future economic damages for the years 1999 through 2003; and (4) $62,500 each year in future noneconomic

---

[2] Because Adams died during the pendency of this case, his wife, Katherine Adams, was appointed as the personal representative of his estate and substituted as a party.

damages for the years 1999 through 2003. The jury further concluded that Shinholster had been twenty percent comparatively negligent in her actions after April 7, 1995, by not regularly taking her prescribed blood pressure medication. Consistent with the jury's verdict, the trial court entered judgment for plaintiff in the amount of $916,480, "subject to any applicable statutory limitation, statutory cap, adjustment regarding the computation of comparative negligence or adjustment pursuant to the collateral source rule." The trial court denied defendants' motion for reconsideration. The Court of Appeals affirmed but remanded for the recalculation of damages. *Shinholster v Annapolis Hosp*, 255 Mich App 339, 360; 660 NW2d 361 (2003). Defendants now appeal to this Court.

## II. STANDARD OF REVIEW

Statutory interpretation is an issue of law that is reviewed de novo. *People v Morey*, 461 Mich 325, 329; 603 NW2d 250 (1999).

## III. ANALYSIS

This Court's primary task in construing a statute is to discern and give effect to the intent of the Legislature. *Murphy v Michigan Bell Tel Co*, 447 Mich 93, 98; 523 NW2d 310 (1994). "The words of a statute provide

6

'the most reliable evidence of [the Legislature's] intent . . . .'" *Sun Valley Foods Co v Ward*, 460 Mich 230, 236; 596 NW2d 119 (1999), quoting *United States v Turkette*, 452 US 576, 593; 101 S Ct 2524; 69 L Ed 2d 246 (1981). In discerning legislative intent, a court must "give effect to every word, phrase, and clause in a statute . . . ." *State Farm Fire & Cas Co v Old Republic Ins Co*, 466 Mich 142, 146; 644 NW2d 715 (2002). The Court must consider "both the plain meaning of the critical word or phrase as well as 'its placement and purpose in the statutory scheme.'" *Sun Valley, supra* at 237, quoting *Bailey v United States*, 516 US 137, 145; 116 S Ct 501; 133 L Ed 2d 472 (1995). "The statutory language must be read and understood in its grammatical context, unless it is clear that something different was intended." *Sun Valley, supra* at 237. "If the language of a statute is unambiguous, the Legislature must have intended the meaning clearly expressed, and the statute must be enforced as written." *Id*. at 236.

### A. Plaintiff's Pre-Treatment Negligence

#### 1. MCL 600.6304

MCL 600.6304 generally provides that the trier of fact in a tort action shall determine by percent the comparative negligence of all those who are a proximate cause of the

plaintiff's injury and subsequent damages.  In relevant part § 6304 provides:

> (1) In an action based on tort . . . seeking damages for personal injury . . . or wrongful death involving fault of more than 1 person, . . . the court . . . shall instruct the jury to answer special interrogatories or, if there is no jury, shall make findings indicating both of the following:

> (a) The total amount of each plaintiff's damages.

> (b) The percentage of the total fault of all persons that contributed to the death or injury, including each plaintiff . . . .

> (2) In determining the percentages of fault under subsection (1)(b), the trier of fact shall consider both the nature of the conduct of each person at fault and the extent of the causal relation between the conduct and the damages claimed.

> * * *

> (6) If an action includes a medical malpractice claim against a person or entity described in section 5838a(1), 1 of the following applies:

> (a) If the plaintiff is determined to be without fault under subsections (1) and (2), the liability of each defendant is joint and several . . . .

> (b) If the plaintiff is determined to have fault under subsections (1) and (2) . . . the court shall determine whether all or part of a party's share of the obligation is uncollectible from that party, and shall reallocate any uncollectible amount among the other parties . . . .

> * * *

> (8) As used in this section, "fault" includes an act, an omission, conduct, including intentional conduct, a breach of warranty, or a

8

breach of a legal duty, or any conduct that could give rise to the imposition of strict liability, that is a proximate cause of damage sustained by a party.[3]

On the basis of this statute, defendants contend that the trial court erred in not allowing the jury to consider Shinholster's behavior as manifesting comparative negligence when she failed to regularly take her prescribed blood pressure medication for at least a year before her first visit to the emergency room.

While the Court of Appeals acknowledged that § 6304, on its face, requires a trier of fact to consider such negligence, it nonetheless relied on inferences drawn from this Court's decision in *Podvin v Eickhorst*, 373 Mich 175; 128 NW2d 523 (1964), and authority from other states to reach its holding that the statute did not control the situation.

The Court of Appeals erred, in our judgment. Subsection 6304(1)(b) is unambiguous and calls for the trier of fact to assess by percentage "the total fault of

---

[3] See, also, MCL 600.2959, which provides:

In an action based on tort or another legal theory seeking damages for personal injury, property damage, or wrongful death, the court shall reduce the damages by the percentage of comparative fault of the person upon whose injury or death the damages are based . . . .

9

*all* persons that contributed to the death or injury, *including each plaintiff*," (emphasis added), as long as that fault constituted a proximate cause of the plaintiff's injury and subsequent damage.[4]

With regard to what cause constitutes proximate cause,[5] in *Parks v Starks*, 342 Mich 443, 448; 70 NW2d 805 (1955), we quoted with approval the following from 38 Am Jur, Negligence, § 55, p 703:

> "The proximate cause of an injury is not necessarily the immediate cause; not necessarily the cause nearest in time, distance, or space. Assuming that there is a direct, natural, and continuous sequence between an act and an injury, * * * the act can be accepted as the proximate cause of the injury without reference to its separation from the injury in point of time or distance."

Thus, under § 6304, if a defendant presents evidence that would allow a reasonable person to conclude that a plaintiff's negligence constituted a proximate cause of her

---

[4] Moreover, MCL 600.6304(6) expressly acknowledges that a plaintiff may be determined "to have fault" in "a medical malpractice claim . . . ."

[5] See, also, *Skinner v Square D Co*, 445 Mich 153, 162-163; 516 NW2d 475 (1994), and M Civ JI 15.01 which provides the following definition of proximate cause:

> When I use the words "proximate cause" I mean first, that the negligent conduct must have been a cause of plaintiff's injury, and second, that the plaintiff's injury must have been a natural and probable result of the negligent conduct.

10

injury and subsequent damage,[6] the trier of fact must be allowed to consider such evidence in apportioning fault.[7]

With regard to the Court of Appeals and Justice CAVANAGH and Justice WEAVER's reliance, in their concurrence/dissents, on out-of-state authority reaching a different conclusion than our Legislature did on this issue, we presume that the legislators were aware of those approaches and chose to depart from them in establishing Michigan law.[8]

---

[6] Because damage cannot arise on its own, but must flow from an injury, we disagree with Justice CAVANAGH's assertion in his concurrence/dissent that the majority "subverts the text of MCL 600.6304" by focusing on "plaintiff's injury" rather than "plaintiff's damage." *Post* at 3-4. Damage can only be the result of an injury. That is, first an injury to plaintiff must exist and the trier of fact must then determine whether plaintiff constituted a proximate cause of such injury before there is any need for the trier of fact to focus on plaintiff's damages. Thus, we believe we are correct when we state at pp 10-11 that § 6304 applies where plaintiff's pre-treatment negligence constituted a proximate cause of her "injury and subsequent damage."

[7] In her opinion, Justice WEAVER criticizes the majority because it "does not offer any analysis regarding *why* it is appropriate to consider plaintiff's pretreatment negligence as a proximate cause of her death, but simply states that it may be considered." *Post* at 4. However, on pp 9-10, we analyze the language of § 6304 in support of this holding. Such language is the only reason why it is "appropriate" to consider pretreatment negligence.

[8] In her opinion, Justice WEAVER asserts that "all the other state courts that have considered the question whether a patient's own pre-treatment negligence could be considered a proximate cause of the patient's damages for purposes of comparative negligence have ultimately decided that it should not." *Post* at 4. We simply note the
(continued . . . .)

11

Moreover, the Court of Appeals reliance on inferences drawn from *Podvin* (the plaintiff's negligence in causing a car accident could not be cited as contributory negligence for subsequent medical malpractice in treating car accident injuries) is misplaced. This case is not relevant because it was decided at a time when any contributory negligence barred a plaintiff's lawsuit. If it was ever relevant, it stopped being so when this Court adopted pure comparative negligence. *Placek v Sterling Hts*, 405 Mich 638, 701; 275 NW2d 511 (1979). Moreover, to the extent that the inferences drawn from *Podvin* are inconsistent with MCL 600.6304, the statute must prevail.

The Court of Appeals also erred by mischaracterizing Shinholster's conduct as merely creating the *condition* that led her to seek treatment. Decedent's conduct may have

_____

(continued . . . .)
obvious, *to wit*, no other state was interpreting the specific language of Michigan law, MCL 600.6304. See also *Wyatt v United States*, 939 F Supp 1402, 1412 (ED Mo, 1996) (holding that under Missouri law, Mo Rev Stat 538.230, which requires the trier of fact "[i]n any action against a health care provider for damages for personal injury or death on account of the rendering of or failure to render health care services" to "apportion fault among . . . parties," it was proper for the trial court to reduce the plaintiff's medical malpractice damages in accord with the plaintiff's own negligence that "substantially contributed to initially cause" the reason for which the plaintiff sought medical treatment).

done more than that.  Her failure to properly take her medications may in fact have constituted a proximate cause of her death.[9]

### 2. Limited Remand

Because the trial court ruled that not all decedent's pre-treatment negligence could be considered, defendants were limited to submitting evidence that decedent was comparatively negligent only from April 7 onward, when she first visited the emergency room.  Yet, it is apparent from that testimony that, had a wider scope of questioning been allowed, just as defendants' expert testimony supported the proposition that failure for ten days (April 7 through April 16) to regularly take her medications constituted a proximate cause,[10] it may well have supported the same

---

[9] It is possible to hypothesize situations where a plaintiff's pre-treatment negligence will do nothing more than create the condition leading the plaintiff to seek treatment.  In such a situation, the negligent practitioner might be found to constitute a superseding cause that produced an injury different in kind.  For example, if a person negligently broke her leg and during surgery to set the leg the doctor cut an artery causing her to bleed to death, the decedent's original negligence could be said to have done no more than bring the plaintiff to the operating table.  But, if the surgeon merely set the broken leg negligently, such an injury would constitute a natural and foreseeable result of the plaintiff's original negligence.

[10] One of defendants' experts, Dr. Bradford Walters, testified as follows:

(continued . . . .)

(continued . . . .)

Q. Does Mrs. Shinholster have a duty to take her medication as prescribed?

A. She does.

* * *

Q. I want you to assume for this next question that as of April 7, 1995 and continuing through April 16th, 1995 when Mrs. Shinholster went into the hospital, I want you to assume that she did not take her Procardia as prescribed.

A. So assumed.

Q. I want you to assume she maintained her normal habit and routine regarding that, and she only took it when she didn't feel well[.]

A. I will assume that.

Q. Assuming that to be true, do you have an opinion based upon a reasonable degree of medical certainty that Mrs. Shinholster's failure to take the Procardia as prescribed from April 7 through April 16, 1995 was a proximate cause of her stroke and ultimate death?

A. I think it was one of the reasons, yes. It was a proximate cause.

Q. Why would her failure to take her medication as prescribed be a proximate cause of her stroke and death?

A. One of the worst things that can happen to a patient who has high blood pressure is to take their medication intermittently. The blood pressure comes down. The medication wears off. The blood pressure soars up. The blood pressure comes down. If and when they take it again, it's sort [of] like a hammer hit to the brain each time that happens.

When blood pressure medications are taken on a regular basis there's a much smoother lowering of blood pressure and you don't get those spikes up and down and up and down.

(continued . . . .)

14

conclusion for a greater period. Accordingly, the trial court clearly erred in precluding evidence made admissible by § 6304, and this prevented defendants from receiving a fair trial with regard to the apportionment of damages. MCR 2.611(A)(1)(a). Because the jury in this case has already determined that defendants breached their standard of care, a determination that I note defendants have never appealed,[11] I would reverse the judgment of the Court of

<hr>

(continued . . . .)

Those spike[s] up and down can possibly cause what happened to Mrs. Shinholster and a stroke like this . . . .

* * *

*Q.* So one of the things you have [a] problem with Betty Shinholster is she must not have been taking her meds as prescribed. Is that what you believe?

*A.* That's what I believe.

*Q.* Do you believe that caused her death?

*A.* I believe it was one of several factors. Whether I can say it is the cause, the ultimate cause, would be nice for black and white purposes. But nothing is quite that black and white. But I think it was one part of a jig saw puzzle, and that was definitely one piece.

*Q.* Let me ask you this, sir: If she had taken her blood pressure medication exactly as the doctor told her to do you believe she would be alive?

*A.* I think there was a good chance that she may have been.

[11] While a remand for a determination of damages only is generally disfavored by this Court, see *Garrigan v*

(continued . . . .)

Appeals and remand this case for calculation of damages only, ordering that the jury be permitted to consider Shinholster's pre-treatment negligence in apportioning fault concerning plaintiff's damages.

While I do not dispute the correctness of the Chief Justice's analysis in her concurrence/dissent concerning the prima facie elements of a tort cause of action, *post* at 8, I nonetheless believe that such analysis must be placed within the proper context. In a tort action, the plaintiff bears the burden of proving his prima facie case by

---

(continued . . . .)
*LaSalle Coca-Cola Bottling Co*, 373 Mich 485, 489; 129 NW2d 897 (1964), such remand is proper "when liability is clear." *Burns v Detroit*, 468 Mich 881; 658 NW2d 468 (2003), citing *Bias v Ausbury*, 369 Mich 378, 383; 120 NW2d 233 (1963). See, also, *Peisner v Detroit Free Press, Inc,* 421 Mich 125, 129; 364 NW2d 600 (1984); *Smith v Chippewa Co Bd of Co Rd Comm'rs*, 381 Mich 363, 381; 161 NW2d 561 (1968). Here, neither at trial nor on appeal have defendants argued that plaintiff's pre-treatment negligence affected the proper standard of care defendants owed to plaintiff. Defendants have only sought to admit evidence of plaintiff's pre-treatment negligence in an effort to offset the extent of their liability. That is, while defendants acknowledge that they have breached the appropriate standard of care, and, thus, are liable to some extent for plaintiff's injuries because they were "a" proximate cause of such injuries, they also assert that plaintiff's pre-treatment negligence also was "a" proximate cause of plaintiff's injuries and, thus, have requested that such negligence be considered by the jury in determining which party is responsible for what percentage of proximate causation. Accordingly, given the particular facts and circumstances of this case, I would remand for damages only.

16

demonstrating, as the Chief Justice has noted: (1) duty, (2) breach, (3) proximate causation, and (4) damages. If in this case, plaintiff had been permitted to present evidence demonstrating defendant's breach—which evidence was later held to be inadmissible—a remand for an entirely new trial might well be required, because such evidence would, in fact, implicate whether defendant had breached a duty, and, therefore, whether plaintiff had satisfied the prima facie elements of a tort action.

In the instant case, as in all tort actions, plaintiff bore the burden of proving her prima facie case, irrespective of her own negligent conduct. It was only after the jury determined that plaintiff had satisfied this burden, and that defendants were liable, that the jury should have considered whether defendants satisfied *their* burden of demonstrating that, despite their own liability, they were not exclusively liable because plaintiff herself was also negligent. Because the challenged evidence in this case has nothing to do with defendants' conduct, and thus nothing to do with whether plaintiff has satisfied her prima facie tort case, I believe that the Chief Justice's assertion that "[l]imiting the new trial to damages only ignores the important fact that proximate cause is

17

essential to a plaintiff's prima facie case," is incorrect. *Post* at 8.

It is important to remember that the conduct of plaintiff, not that of defendants, is at issue here, and that the issue is whether defendants satisfied their burden of demonstrating that, although liable, they are not exclusively liable for plaintiff's injury.[12]  That is, we

---

[12] In response to Chief Justice CORRIGAN'S assertion in her concurrence/dissent that "defendants have preserved the argument that a new trial on all issues is required because the proximate cause issue affects liability," *post* at 7 n 2, I note that in the quoted portion of defendants' brief, defendants only contend that, had plaintiff's pre-treatment negligence been considered by the jury, it may have found that "such negligence was *a* proximate cause of the fatal stroke" (emphasis added).  That is, defendants never contend that they are not liable because, had plaintiff's pre-treatment negligence been considered by the jury, it would have determined that they were not a proximate cause of plaintiff's injury, but they contend only that, had the jury been able to consider such negligence, the extent of their own liability would have been reduced.

Further, I find the citations of MCL 600.2959 and M Civ JI 11.01 unpersuasive in support of such position. *Post* at 9-10.  Both the statute and the jury instruction expressly address comparative fault, which generally comes into play only during the damages phase of trial, *after* the jury has determined that a plaintiff has proven her prima facie tort case.  While, as the Chief Justice correctly asserts, evidence may be presented throughout trial regarding a plaintiff's comparative fault, *post* at 11, such evidence generally does not affect whether a defendant was liable at all for a plaintiff's injury, but rather the *extent* of his liability.  Where such evidence *is* sufficiently intertwined with liability, however, there is absolutely no barrier to the appellate court remanding for

(continued . . . .)

18

are not considering whether plaintiff satisfied her initial burden of proof relating to whether defendants were a proximate cause of her injury and, thus, are liable.[13]

Certainly, defendants could have argued that, had the jury been permitted to consider plaintiff's pre-treatment negligence, it would not have found that defendants had breached their standard of care at all or that defendants' breach constituted a proximate cause of plaintiff's injury. However, defendants did not make such an argument. Instead, they argued only that evidence of plaintiff's own negligence should be considered by the jury in order to determine the *extent* to which defendants were liable for plaintiff's injury. (Defendants alleged: "Had the jury been properly instructed [concerning plaintiff's pre-

(continued . . . .)
an entirely new trial. Because defendants themselves, unlike the concurrence/dissent, have never argued that, "had the jury been permitted to consider plaintiff's pre-treatment negligence, it would not have found that defendants breached their standard of care or that defendants' breach was a proximate cause of plaintiff's injury," I continue to believe that a remand for damages only is warranted under the circumstances of this case.

[13] A majority of this Court favors remanding this case to the trial court, but there is no majority in favor of any specific type of remand. Three justices favor remanding this case for an entirely new trial, one justice favors remanding this case for a determination of damages only, and three justices favor no form of remand at all. It is regrettable that no further guidance can be offered to the trial court.

treatment negligence], it is likely that the percentage of her comparative fault would have been determined at a much higher level").[14]

---

[14] I am concerned that, if this Court were to accept Chief Justice CORRIGAN's assertion that this case be remanded for an entirely new trial, we would be required to remand for an entirely new trial in virtually all cases in which not *every* single aspect of a plaintiff's pre-treatment negligence was fully considered at trial. For instance, assume a case in which a defendant-doctor is found to be liable in a medical malpractice action in which he has breached the appropriate standard of care and has been determined to have been a proximate cause of the plaintiff's injury and subsequent damages. The trial judge has allowed the defendant to present evidence regarding the plaintiff's own alleged negligence and the jury accordingly has found the plaintiff to be ten percent liable for the damages and the doctor to be ninety percent liable. However, the defendant wanted evidence admitted at trial of one additional, albeit slight, instance of the plaintiff's own negligence that the trial judge ruled inadmissible. The defendant believes that, had this evidence been admitted, the jury would have found the plaintiff to have been twelve percent liable rather than ten percent and, thus, the defendant to have been eighty-eight percent rather than ninety percent liable. If an appellate court finds that the trial judge erred in ruling the additional evidence of the plaintiff's negligence inadmissible, should a remand for an entirely new trial be required? In my judgment, it makes considerable sense, and represents a far more prudent use of judicial resources to remand for a redetermination of damages only in such a case, which would allow the defendant to present the additional evidence and the jury to determine whether the plaintiff's percentage of liability should be increased, and the defendant's percentage of liability decreased, accordingly. Nothing, of course, would prohibit an appellate court from remanding for an entirely new trial in subsequent cases if the facts require.

20

## B. Cap on Noneconomic Damages

For the reasons stated in *Jenkins, supra* at ___, we hold that the noneconomic damages cap found in MCL 600.1483 applies to a wrongful death action based on an underlying claim of medical malpractice.

MCL 600.1483 contains two caps on noneconomic damages and provides:

> (1) In an action for damages alleging medical malpractice by or against a person or party, the total amount of damages for noneconomic loss recoverable by all plaintiffs, resulting from the negligence of all defendants, shall not exceed $280,000.00 unless, as the result of the negligence of 1 or more of the defendants, 1 or more of the following exceptions apply as determined by the court pursuant to section 6304, in which case damages for noneconomic loss shall not exceed $500,000.00:
>
> (a) The plaintiff is hemiplegic, paraplegic, or quadriplegic resulting in a total permanent functional loss of 1 or more limbs caused by 1 or more of the following:
>
> (i) Injury to the brain.
>
> (ii) Injury to the spinal cord.
>
> (b) The plaintiff has permanently impaired cognitive capacity rendering him or her incapable of making independent, responsible life decisions and permanently incapable of independently performing the activities of normal, daily living.
>
> (c) There has been permanent loss of or damage to a reproductive organ resulting in the inability to procreate.

While defendants have not contested that, as a result of her stroke, Shinholster satisfied § 1483(1)(a) and (b),

21

they and the Chief Justice contend that the higher damages cap applies only if the injured person continues to suffer one of the enumerated conditions set forth in § 1483 *at the time of judgment.* *Post* at 15-16. Because Mrs. Shinholster was dead at the time of judgment, defendants and the Chief Justice reason that the higher cap cannot apply. In support of their position, they rely upon the fact that the statute specifically uses the present tense of verbs, i.e., "is" and "has," and that the statute provides that the lower tier is to apply "unless, as the result of the negligence of 1 or more of the defendants, 1 or more of the following exceptions apply *as determined by the court pursuant to section 6304 . . . .*" *Post* at 15-16. Because a trial court reduces damages pursuant to § 6304 only after the jury has rendered its verdict, defendants and the Chief Justice conclude that the present tense verbs in the statute refer to that precise moment in time at which "the trial court makes its post-verdict determination concerning whether the cap requires adjustment of the verdict." *Post* at 15.[15] While the trial court noted that the Legislature

---

[15] Thus, for example, assume that a jury renders a $500,000 verdict at 5 PM on a Monday in favor of an injured party who, at the time of such verdict, was alive and clearly satisfied one of the enumerated higher cap injuries

(continued . . . .)

used the present tense words "is . . . hemiplegic," it also observed that the Legislature did not specify at which time plaintiff must have sustained that condition for the higher cap to apply. The trial court disagreed with defendants' construction of the statute and ruled:

> [T]he only sensible way to interpret the statute is to hold that the Legislature intended [the higher cap] to apply to people who had been rendered cognitively incapable, quadriplegic, etc., from the accident in question. Betty Shinholster met this condition here: as the jury found, she suffered the requisite injuries from the accident-- she endured these injuries in the several months she lay in a coma before she died. We thus hold that the higher, $500,000 cap applies.

The Court of Appeals agreed with the trial court:

> We construe the statute in accordance with the trial court's ruling. Indeed, the adoption of defendants' position would lead to absurd and unfair results. For example, a person who endured months of paraplegia caused by medical malpractice but died of an unrelated and independent cause before the court's verdict adjustments would be subject to the lower cap, whereas a similar person who died a day after the court's verdict adjustments would be subject to the higher cap. We view the better approach to be that advocated by plaintiff and adopted by the trial court. Under this approach, the point of

---

(continued . . . .)
of § 1483. However, later that evening, the injured party dies. The next morning at 9 AM, the trial court, expecting to grant damages pursuant to the higher tier, prepares to enter his post-verdict determination as required by § 6304. He is informed, however, that the injured party has died the prior evening. In accordance with the Chief Justice's understanding, the judge would now be required to award the decedent's survivors damages pursuant to the lower tier.

23

> reference for determining whether the injured person fits within MCL 600.1483(1)(a), (b), or (c) is any time after and as a result of the negligent action.  Therefore, because Shinholster was rendered incapacitated by defendants' negligence, the higher cap applies. [*Shinholster, supra* at 354.]

We agree with the results reached by the lower courts and hold that § 1483 permits a plaintiff to recover a maximum of $500,000 in medical malpractice noneconomic damages if, as a result of the defendant's negligent conduct, the plaintiff at some point thereafter, and while still living, suffered one of the enumerated conditions of § 1483.  We base this interpretation on several textual indicators contained in § 1483 and other pertinent statutes.

First, this interpretation of § 1483 is consistent with the text of the statute itself, which, as noted, provides that the lower tier applies "unless, *as the result of the negligence of 1 or more of the defendants*, 1 or more of the following exceptions apply . . . ."  As long as, at some point after the defendant's alleged negligence occurred and before the decedent's death, it could be said that, "as the result of the negligence of 1 or more of the defendants . . . [t]he plaintiff is hemiplegic" or the plaintiff "has permanently impaired cognitive capacity" or "[t]here has been permanent loss of or damage to a

reproductive organ," the higher damages cap tier applies.[16]

Not only is this understanding of § 1483, and specifically its use of the present tense of verbs, consistent with this Court's decision in *Michalski v Bar-Levav*, 463 Mich 723, 732-733; 625 NW2d 754 (2001)(construing provisions of the

---

[16] In asserting that, because the "death exception was eliminated when the statute was amended in 1993 to its current form," this shows "that the Legislature intended to exclude death from the exceptions giving rise to application of the higher cap," *post* at 14, we believe that the Chief Justice accords unmerited weight to the elimination of the "death exception" in interpreting the current version of § 1483. The 1986 version of § 1483 provided, in relevant part:

> (1) In an action for damages alleging medical malpractice against a person or party specified in section 5838a, damages for noneconomic loss which exceeds $225,000.00 shall not be awarded unless 1 or more of the following circumstances exist:

> (a) There has been a death.

Thus, under the former § 1483, which had a *single*-tiered system of noneconomic damages cap, if a death occurred, there was no cap on damages. However, the current § 1483 contains a *two*-tiered system of noneconomic damages cap, and no longer contains a "death exception." By eliminating the "death exception," we believe the Legislature intended nothing more than that one of the statute's two caps apply to limit noneconomic damages in every medical malpractice action, including those filed under the wrongful death act. We are unclear about the rationale relied upon by the Chief JUSTICE in assuming that, because the Legislature eliminated death as an outright exception to the application of any cap, that it must have intended that death always fall under the *lower* cap. We see no rationale for assuming such a conclusion from the Legislature's actions.

25

Handicappers Civil Rights Act, MCL 37.1101, which are also written in the present tense, yet holding that the "present" tense refers to events existing during the pendency of the plaintiff's employment, when her cause of action arose), but it also avoids the arguably incongruous results about which the trial court and Court of Appeals were concerned.[17]

Second, we believe that the text of the wrongful death act, MCL 600.2922(1), (2), and (6), provides additional support for our understanding of § 1483. These provisions state that "the personal representative of the estate of the deceased person" be able to "maintain an action and recover damages [against] the person who or the corporation that would have been liable, if death had not ensued . . . ." Subsection 2922(6) expressly permits the deceased's estate to recover "reasonable compensation for

---

[17] We note that defendants' and the Chief Justice's positions, taken to their inevitable conclusions, might just as well require that, if the injured party is deceased at the time of judgment, the higher cap tier would *always* apply. This is because: (1) a deceased person always "has permanently impaired cognitive capacity rendering him or her incapable of making independent, responsible life decisions and permanently incapable of independently performing the activities of normal, daily living"; and (2) if the injured person is deceased, "[t]here has [always] been permanent loss of or damage to a reproductive organ resulting in the inability to procreate."

the pain and suffering, while conscious, undergone by the deceased person during the period intervening between the time of the injury and death . . . ." Accordingly, while we agree with the Chief Justice that the Legislature is free to make "a policy decision that the survivors of dead medical malpractice victims are entitled to lesser damages than are living medical malpractice victims who are suffering from one of the three types of permanent conditions enumerated in [§ 1483]," *post* at 14-15, we see no indication in the statute that the Legislature, in fact, *made* such a decision; rather, we believe that the Legislature made a quite contrary policy decision in § 2922(1), (2), and (6) by permitting a decedent's estate to recover *everything* that the decedent would have been able to recover had she lived.

Third, we believe that the interplay between the wrongful death act, particularly § 2922(6), and § 1483 provides additional textual support for our understanding of § 1483. Subsection 2922(6) states that in a wrongful death action "the court or jury may award . . . *reasonable compensation* for the pain and suffering, while conscious, undergone by the *deceased* person during the period intervening between the time of the injury and death . . . ." (Emphasis added.) Section 1483 provides that

pain and suffering resulting from certain enumerated injuries are compensable at a higher rate. Thus, the Legislature has apparently determined that "reasonable compensation" for such pain and suffering may sometimes be in excess of $280,000. However, by concluding that, no matter what type of injuries resulted in a decedent's death, survivors in a wrongful death action may *never* recover under § 1483's higher cap if the decedent is dead at the time of judgment, defendants and the Chief Justice effectively preclude the awarding of "reasonable compensation" under § 2922(6) for the conscious pain and suffering undergone by at least some decedents before their death, where such pain and suffering resulted from one of the enumerated injuries in § 1483. That is, we believe that defendants and the Chief Justice overlook the express directive of § 2922(6) that the jury may award "reasonable compensation" for a decedent's conscious pain and suffering—compensation which, in the Legislature's estimation, may sometimes be in excess of $280,000 if conscious pain and suffering results from an injury enumerated in § 1483.

Finally, in asserting that the higher damages cap of § 1483 applies only where the plaintiff is suffering one of the conditions enumerated in the statute *at the time of*

*judgment*, we believe that defendants and the Chief Justice give extraordinary and undue weight to the fact that the Legislature has used the present tense of the verbs in § 1483(1)(a) and (b). Particularly, in concluding that "the structure of § 1483(1) indicates that the Legislature intended that an exception, if it is applicable, apply at the time [of judgment]," *post* at 10, we note that the Chief Justice fails to ensure that her own interpretation of § 1483 is consistent with the Legislature's use of the verb tense "has been" in § 1483(1)(c). This use of the *past* tense of the verb indicates an intention by the Legislature that an injured party need not always be alive at the time of judgment for the higher cap to apply, but rather only have suffered, at some point in the past as the result of a defendant's negligent conduct, the type of injury enumerated in § 1483(1)(c).

Further, we note that, had the Legislature truly intended that an injured party must continue to suffer the higher tier injury at the time of judgment, it knew how to make that intent specific, as shown by MCL 600.6311, *infra*, in which the Legislature states that this provision is to apply if "a plaintiff . . . is 60 years of age or older *at the time of judgment.*" (Emphasis added.) Unlike § 6311, § 1483 does not provide such a clear temporal framework.

29

Moreover, had the Legislature intended that the term "is," as used in § 6311, mean what defendants and the Chief Justice assert it means in § 1483 (i.e., at the time of judgment), we see no indication in § 6311 that the Legislature qualified the term within the temporal framework of "at the time of judgment."

Defendants and the Chief Justice fail to explain why the use of the present tense of verbs in § 1483(1)(a) and (b) demonstrates that the Legislature intended that a plaintiff suffer from one of the enumerated conditions at the time of judgment, rather than at the time the action is filed, the jury is selected, opening statements are made, the first witness takes the stand, closing statements are made, at the beginning of jury deliberations, or at the time at which the jury renders its verdict.[18]  Defendants

---

[18]  Absent specific language in § 1483 stating otherwise, and in light of the textual evidence set forth in this section, we are simply not persuaded that, whether the higher tier applies is to be viewed as a function of wholly arbitrary facts and circumstances concerning the specific time at which final judgment is rendered, such as the nature and congestion of the trial court's docket, the existence of scheduling conflicts of the parties and their attorneys, or the sheer length of a trial.  Nor can it reasonably be dispositive of whether the higher tier applies that a plaintiff has died shortly before or after the end of trial, or shortly before or after the post-verdict damages and cap determinations.  See n 15.  Nor do we understand why delaying tactics in the justice process

(continued . . . .)

and the Chief Justice assert that the Legislature showed an intent to set the temporal framework at the time of judgment by stating that the higher tier exception applies "*as determined by the court pursuant to section 6304 . . . .*"  However, in our judgment, references in § 1483 to § 6304 serve merely to clarify under which statute the court is authorized and required to reduce the damages award consistent with § 1483.  We do not read into this reference a legislative intent to bar a plaintiff, whose decedent has suffered while still alive and has suffered "as the result of the negligence of 1 or more of the defendants, 1 or more of the following [injuries]," from recovering pursuant to the higher tier merely because the plaintiff's decedent was unfortunate enough to die before the post-verdict damages determination.  Rather, on the basis of the statutory language previously discussed, we believe that the better interpretation of the statute is that, as long as a plaintiff suffers, while still living and as a result of a defendant's negligent conduct, one of the enumerated conditions set forth in § 1483, the statute's higher damages cap applies.

---

(continued . . . .)
should be incentivized in the perverse expectation that a plaintiff may not survive trial and judgment.

31

Because plaintiff in this case presented evidence from which it could be rationally concluded that, "as the result of the negligence of 1 or more of the defendants," it could have been said at some time before her death that she "is hemiplegic, paraplegic, or quadriplegic [as a result of] [i]njury to the brain," or "has permanently impaired cognitive capacity," we agree with the determination made by the lower courts that the higher damages cap of § 1483 applies under the circumstances of this case.

### C. MCL 600.6311

While MCL 600.6306(1)(c), (d), and (e) provide that all future damages awarded to a plaintiff be reduced to gross present value,[19] MCL 600.6311 creates an exception to

---

[19] Section 6306 provides, in part:

(1) After a verdict rendered by a trier of fact in favor of a plaintiff, an order of judgment shall be entered by the court . . . in the following judgment amounts:

* * *

(c) All future economic damages, less medical and other health care costs, and less collateral source payments determined to be collectible under section 6303(5) reduced to gross present cash value.

(d) All future medical and other health care costs reduced to gross present cash value.

(continued . . . .)

32

this general rule by stating, "Sections 6306(1)(c), (d), and (e) . . . do not apply to a plaintiff who is 60 years of age or older at the time of judgment." Thus, only when a plaintiff is younger than sixty years of age at the time of judgment, must the trial court reduce the plaintiff's future damages to present cash value.

Plaintiff asserts that, for purposes of § 6311, the term "plaintiff" in a wrongful death action is either the personal representative or the decedent, based on the age that the decedent would have been had she been alive at the time of judgment. On the other hand, defendants and the Chief Justice contend that § 6311 is a limited exception that does not apply to a wrongful death action because the "plaintiff" in such an action is the estate, which cannot have an age. *Post* at 20.

The trial court held that, for purposes of § 6311, the term "plaintiff" refers to the decedent in a wrongful death case, and that because Shinholster was sixty-one at the time of her death, she necessarily would have been "60 years of age or older at the time of judgment." Thus, § 6306(1)(c), (d), and (e) do not apply. Although the Court

_____

(continued . . . .)
     (e) All future noneconomic damages reduced to gross present cash value.

of Appeals found that § 6311 is "ambiguous with regard to the term 'plaintiff' as applied to wrongful death cases," *Shinholster, supra* at 357, that Court declined to resolve the issue, holding that § 6311 applies because *both* the personal representative and the decedent were or would have been sixty years of age or older at the time of judgment:

> MCL 600.6311 specifically refers to "a *plaintiff* who is 60 years of age or older . . ." (emphasis added). Accordingly, we could potentially hold that because the plaintiff here—Shinholster's personal representative—was over sixty, the MCL 600.6311 exception applied. However, we note that MCL 600.6306 also uses the term "plaintiff" in referring to comparative negligence. See MCL 600.6306(3)("the total judgment amount shall be reduced . . . by an amount equal to the percentage of plaintiff's fault"). Clearly, this reference to "plaintiff" is not a reference to a personal representative in a wrongful death case, because the personal representative would not be the one evaluated for comparative negligence; instead, the decedent would be so evaluated. We conclude that the statues at issue are essentially ambiguous with regard to the term "plaintiff" as applied to wrongful death cases.

> However, it is not necessary, in the instant case, to resolve the ambiguity in MCL 600.6311. Indeed, both the "plaintiff" (i.e., the personal representative and the person who brought the lawsuit) and the decedent in this case satisfied the MCL 600.6311 exception. Accordingly, the trial court did not err by refusing to reduce the amount of future damages to present value. [*Shinholster, supra* at 356-357.]

The doctrine of *noscitur a sociis*, i.e., that "a word or phrase is given meaning by its context or setting," affords us some assistance in interpreting § 6311. See *G C*

34

*Timmis & Co v Guardian Alarm Co*, 468 Mich 416, 420; 662 NW2d 710 (2003). We apply this doctrine to include the other provisions of Chapter 63 of the Revised Judicature Act because the term "plaintiff" does not stand alone here, and cannot be read in a vacuum. Instead, "[i]t exists and must be read in context with the entire act, and the words and phrases used there must be assigned such meanings as are in harmony with the whole of the statute . . . ." *Arrowhead Dev Co v Livingston Co Rd Comm*, 413 Mich 505, 516; 322 NW2d 702 (1982). "Although a phrase or a statement may mean one thing when read in isolation, it may mean something substantially different when read in context." *G C Timmis & Co, supra* at 421.

MCL 600.6305(2) provides, in part:

> In the event of death, the calculation of future damages shall be based on the losses during the period of time the plaintiff would have lived but for the injury upon which the claim is based.

Further, MCL 600.6306(3) provides, "If the plaintiff was assigned a percentage of fault . . . the total judgment amount shall be reduced . . . by an amount equal to the percentage of plaintiff's fault." As described by the Court of Appeals, these "reference[s] to 'plaintiff' [are] not . . . reference[s] to a personal representative [or an estate] in a wrongful death case, because [neither] would

35

. . . be the one evaluated for comparative negligence; instead, the decedent would be so evaluated." *Shinholster, supra* at 357.[20]  We agree with the trial court and hold that, for purposes of § 6311, the term "plaintiff" refers to the decedent, Mrs. Shinholster.

However, our inquiry into the application of § 6311 in the instant case does not stop there.  Rather, § 6311 states that it applies if the plaintiff is "60 years of age or older *at the time of judgment.*"  (Emphasis added.) Because the term "plaintiff" refers to the decedent in a wrongful death action, and because Shinholster was sixty-one at her death and at the time of judgment,[21] we agree with the trial court's interpretation of § 6311, and hold that, on remand, the trial court cannot reduce any future damages awarded to plaintiff to their present value.

### IV. CONCLUSION

Because § 6304(1) requires, without exception, that a trier of fact be permitted in all "personal injury, property damage, [and] wrongful death" tort actions to

---

[20] Further, no section in Chapter 63 of the Revised Judicature Act uses the term "plaintiff" in reference to the personal representative or the decedent's estate.

[21] At death, a deceased no longer continues to age, and by that same token, we hold that, at death, a deceased does not surrender her age or become without an age, but rather, reasonably, for purposes of § 6311, retains her age.

consider the conduct of all parties whose conduct has constituted a proximate cause of plaintiff's damages, and because, on the basis of the evidence presented by defendants, reasonable minds could find that plaintiff's pre-treatment negligence here constituted "a proximate cause"—a foreseeable, natural and probable consequence—of her fatal stroke, we remand this case to the trial court for proceedings consistent with the opinions of this Court. Further, based on our decision in *Jenkins,* where we held that the medical malpractice noneconomic damages cap of § 1483 applies to a wrongful death action based on an underlying claim of medical malpractice, we affirm the decisions of both lower courts and hold that the higher cap of § 1483 applies when the injured person, at any time while still living and as a result of a defendant's negligent conduct, fits within the ambit of § 1483 (1)(a), (b), or (c). Finally, because the term "plaintiff," as used in § 6311, refers, for purposes of a wrongful death action, to the decedent, and because Mrs. Shinholster, the decedent, was sixty-one at her death and at the time of judgment, we agree with the trial court's interpretation of § 6311, and hold that the trial court cannot reduce any future damages award to plaintiff to their present value.

Stephen J. Markman

CORRIGAN, C.J., and TAYLOR and YOUNG, JJ.

We join in section III(A) and with the determination in section III(B) that the medical malpractice cap of § 1483 applies to a wrongful death action based on an underlying claim of medical malpractice.

Maura D. Corrigan
Clifford W. Taylor
Robert P. Young, Jr.

CAVANAGH and KELLY, JJ.

We join in section III(C) and concur in the result only with regard to section III(B).

Michael F. Cavanagh
Marilyn Kelly

WEAVER, J.

I join in sections III(B) and III(C).

Elizabeth A. Weaver

**S T A T E   O F   M I C H I G A N**

SUPREME COURT

ESTATE OF BETTY JEAN SHINHOLSTER,
Deceased, by JOHNNIE E. SHINHOLSTER,
Personal Representative,

    Plaintiff-Appellee,

v                                   No. 123720

ANNAPOLIS HOSPITAL, assumed name for
OAKWOOD UNITED HOSPITALS, INC.,

    Defendant-Appellant,

and

DENNIS ADAMS, M.D. AND MARY ELLAN
FLAHERTY, M.D.,

    Defendants.

_____

ESTATE OF BETTY JEAN SHINHOLSTER,
Deceased, by JOHNNIE E. SHINHOLSTER,
Personal Representative,

    Plaintiff-Appellee,

v                                   No. 123721

KATHERINE ADAMS, Personal Representative
Of the Estate of DENNIS ADAMS, M.D., and
MARY ELLEN FLAHERTY, M.D.,

    Defendants-Appellants,

and

ANNAPOLIS HOSPITAL, assumed name for
OAKWOOD UNITED HOSPITALS, INC.,

    Defendant.

_____

MARKMAN, J. (*concurring*).

Although I agree fully with the majority analysis, I write separately to elaborate on my views concerning § II(A)(1) of the opinion.

## I. PREVIOUS JURISPRUDENCE

Not only does the clear language of MCL 600.6304 support the majority interpretation, but I believe that this interpretation is consistent with this Court's previous jurisprudence concerning an original tortfeasor's liability in light of subsequent medical malpractice.[1]   In

---

[1] I believe that the distinctions plaintiff, the trial court, the Court of Appeals, and other courts have attempted to draw between "pre-treatment" negligence and "post-treatment" negligence are, not only without statutory basis, but also irrelevant.  Why should a doctor who has treated the plaintiff in the past be held less at fault for his negligence than a doctor who has not treated the plaintiff in the past?  Take, for example, the instant case, where Dr. Normita Vicencio, approximately one year before plaintiff's fatal stroke, prescribed to plaintiff medication to lower her blood pressure.  Assuming that plaintiff had sought additional treatment from Dr. Vicencio, instead of defendants, and assuming further that Dr. Vicencio had acted in the same alleged negligent manner as defendants, plaintiff's alleged negligence would be considered "post-treatment" negligence, and, thus, admissible under both the lower courts' and plaintiff's interpretation of § 6304.  However, because defendants had not treated plaintiff in the past, plaintiff's alleged negligence would be considered "pre-treatment" negligence, and, thus, inadmissible under both the lower courts' and plaintiff's interpretation of § 6304.  Accordingly, defendants would be held more at fault because the trier of

(continued . . . .)

2

the context of medical malpractice, it has long been held that negligent medical treatment of an injury is foreseeable and is ordinarily not a superseding cause that cuts off the causal contribution of the act that caused the injury. In *People v Townsend*, 214 Mich 267; 183 NW 177 (1921), the defendant was driving drunk when he ran off the road and hit a tree, severely lacerating a passenger's legs. Although the passenger was immediately taken to the hospital, her lacerations became infected because of medical malpractice committed by the hospital's doctors, and she died twelve days later from blood poisoning. As a result of this death, the defendant was charged with and convicted of involuntary manslaughter. The defendant appealed his conviction, contending that his passenger's death was a natural and probable result, not of the defendant's drunk driving, but rather of the doctors' negligence. This Court disagreed and stated:

---

(continued . . . .)
fact would not be permitted to consider plaintiff's "pre-treatment" negligence in apportioning fault in relation to determining plaintiff's damages. Because I see no basis in treating defendants any differently than Dr. Vicencio, I cannot agree with the lower courts' and plaintiff's interpretation of § 6304. Plaintiff's alleged negligence should be considered regardless of whether defendants had treated plaintiff in the past.

"If a wound or other injury cause a disease, such as gangrene, empyema, erysipelas, pneumonia, or the like, from which deceased dies, he who inflicted the wound or other injury is responsible for the death. . . . He who inflicted the injury is liable even though the medical or surgical treatment which was the direct cause of the death was erroneous or unskilful, or although the death was due to the negligence or failure by the deceased to procure treatment or take proper care of the wound. . . . This rule is sometimes stated with the qualification that the wound must have been mortal or dangerous; but it is usually held that defendant is liable, although the wound was not mortal."

. . . Defendant cannot exonerate himself from . . . liability by showing that under a different or more skilful treatment the doctor might have saved the life of the deceased and thereby have avoided the natural consequences flowing from the wounds. Defendant was not entitled to go to the jury upon the theory claimed unless the medical treatment was so grossly erroneous or unskilful as to have been the cause of the death, for it is no defense to show that other or different medical treatment might or would have prevented the natural consequences flowing from the wounds.

The treatment did not cause blood poisoning; the wounds did that, and the most that can be said about the treatment is that it did not prevent blood poisoning but might have done so had it been different. [*Id*. at 278-279 (citation omitted).]

Accordingly, under *Townsend*, the original tortfeasor may be liable for a doctor's subsequent negligence where such negligence merely failed to prevent a result that was a "natural consequence[] flowing from" such tortfeasor's actions. See also *People v Bailey*, 451 Mich 657, 679; 549

4

NW2d 325 (1996) ("In the medical treatment setting, evidence of grossly negligent treatment constitutes evidence of a sole, intervening cause of death. Anything less than that constitutes, at most, merely a contributory cause of death, in addition to the defendant's conduct.").[2] Where evidence exists in a medical malpractice action that a doctor's negligence was not the sole proximate cause of the plaintiff's injury, the trier of fact must be permitted to consider other proximate causes for such injury, including the plaintiff's own pre-treatment negligence.[3]

---

[2] "The assumption of a duty to protect the decedent while in defendant's custody merely establishes a legal basis for holding defendant negligent. The mere existence of a duty does not automatically lead to the conclusion that the decedent's fault should not be considered" when appointing fault. *Hickey v Zezulka (On Resubmission)*, 439 Mich 408, 448; 487 NW2d 106 (1992) (Opinion by RILEY, J., joined by three other Justices).

[3] In permitting the trier of fact in a medical malpractice case to consider a plaintiff's negligence in apportioning fault and in determining the extent of a defendant's liability, the majority is not altering the law of this state regarding the application of comparative fault in a tort action. See *Brisboy v Fibreboard Corp*, 429 Mich 540, 551-552, 556; 418 NW2d 650 (1988)(opinion by CAVANAGH, J.) (affirming the jury's determination that the decedent's smoking habit, as well as his exposure to the defendant's asbestos, were both proximate causes, fifty-five and forty-five percent respectively, of the decedent's lung cancer and subsequent death, and remanding the case to the trial court for the appointment of damages in accordance with such determination); *Hardy v Monsanto Enviro-Chem Systems, Inc*, 414 Mich 29, 40; 323 NW2d 270
(continued . . . .)

5

## II. COMPARATIVE NEGLIGENCE

In holding that in a medical malpractice action, the trier of fact should not be permitted to consider a plaintiff's pre-treatment negligence in apportioning fault, the Court of Appeals failed to recognize that § 6304 is predicated upon a comparative negligence scheme that "reduces the amount of the plaintiff's recovery, allocating liability in proportion to fault," *Jennings v Southwood*, 446 Mich 125, 131; 521 NW2d 230 (1994), rather than upon a contributory negligence scheme that "act[s] as an absolute bar to plaintiffs who were only slightly at fault," *Klinke v Mitsubishi* Motors Corp, 458 Mich 582, 607; 581 NW2d 272 (1998) (KELLY J., dissenting).[4]

---

(continued . . . .)
(1982) (holding that "it would be 'anomalous' to hold a defendant liable for damages in excess of the amount causally related to his negligence"); *Placek v Sterling Hts,* 405 Mich 638, 661; 275 NW2d 511 (1979) (holding that "'[t]he doctrine of pure comparative negligence does not allow one at fault to recover for one's own fault, because damages are reduced in proportion to the contribution of that person's negligence, whatever that portion is.'" (Citation omitted.)

[4] The authorities relied on by the Court of Appeals have also sometimes been confused by the doctrines of contributory and comparative negligence. See *Harding v Deiss*, 300 Mont 312, 318; 3 P3d 1286 (2000) (citing contributory negligence cases and stating, "Under [comparative fault], in any case where the patient was responsible for events that led to her hospitalization, the treating physician would not be liable for negligent
(continued . . . .)

6

The Court of Appeals stated:

> "It would be anomalous to posit, on the one hand, that a health provider is required to meet a uniform standard of care in its delivery of medical services to all patients, but permit, on the other hand, the conclusion that, where a breach of that duty is established, no liability may exist if the patient's own preinjury conduct caused the illness or injury which necessitated the care."
>
> * * *
>
> [W]e conclude that the trial court did not err in ruling that the jury could not consider Shinholster's potential negligence in causing the condition for which she sought medical treatment in the first place. Given the preventable nature of many illnesses, to accept a contrary position would allow many health-care professionals to escape liability for negligently treating ill patients. [*Shinholster v Annapolis Hosp,* 255 Mich App 339, 347-348; 660 NW2d 361 (2003), quoting *Harvey v Mid-Coast Hosp*, 36 F Supp 2d 32, 38 (D Maine, 1999).]

Stemming from its concern that "'no liability may exist if the patient's own preinjury conduct caused the illness or injury which necessitated the care,'" or that if a trier of fact was permitted to consider a plaintiff's pre-treatment negligence in apportioning fault, "many health-care professionals [would] escape liability for negligently treating ill patients," the Court of Appeals apparently

---

(continued . . . .)
treatment." This is simply a misstatement of the doctrine of comparative negligence.

7

believed that § 6304 set forth a contributory negligence scheme that barred a plaintiff from recovering for injuries resulting from a defendant's negligence if the plaintiff was even slightly at fault for such injuries. These beliefs are unfounded because, as previously mentioned, § 6304 sets forth a comparative negligence scheme. Nothing in § 6304 states or implies that it constitutes a contributory negligence scheme. By adopting a comparative negligence scheme in § 6304, the Legislature recognized, as this Court did in *Placek v Sterling Hts*, 405 Mich 638, 660; 275 NW2d 511 (1979), that such doctrine "most nearly accomplishes the goal of a fair system of apportionment of damages . . . [by] 'truly distribut[ing] responsibility according to fault of the respective parties.'" (Citation omitted.) The fact that a doctor negligently undertook to treat an existing condition may be an important, and in many cases the overriding, factor in the trier of fact's apportionment of fault in determining damages.[5] There is no

---

[5] "[A]pplying the principles of comparative fault to a medical malpractice action, a physician is liable only for that portion of the plaintiff's damages that were proximately caused by the physician's negligence." *Gray v Ford Motor Co*, 914 SW2d 464, 467 (Tenn, 1996) (holding that the doctrine of comparative fault could properly be applied to medical malpractice actions so as to require an apportionment of fault between the estate of a decedent who
(continued . . . .)

reason to believe that a reasonable trier of fact will not accord that circumstance as much weight and consideration as it deserves in the particular case.  However, there may sometimes be additional factors that will also be relevant in the apportionment of fault in determining damages, including evidence that the plaintiff's own conduct was either negligent, grossly negligent, or even intentional.[6]

### III. ADMISSIBILITY OF EVIDENCE

The majority opinion states that "under § 6304, if a defendant presents evidence that would allow a reasonable person to conclude that a plaintiff's negligence constituted a proximate cause of her injury and subsequent damages, the trier of fact must be allowed to consider such

---

(continued . . . .)
acted negligently in causing her original injury and a physician who acted negligently in treating such injury). See also *Wyatt v United States*, 939 F Supp 1402, 1412 (ED Mo, 1996)(holding that under Missouri law, Mo Rev Stat 538.230, which requires the trier of fact "[i]n any action against a health care provider for damages for personal injury or death on account of the rendering of or failure to render health care services" to "apportion fault among . . . parties," it was proper for the trial court to reduce the plaintiff's medical malpractice damages in accord with the plaintiff's own negligence which "substantially contributed to initially cause" the reason for which the plaintiff sought medical treatment).

[6] "This goal [of a fair apportionment of damages] is not served; rather, it is thwarted when a slightly negligent defendant is held liable for one hundred percent of the damages caused principally by the wrongful intentional conduct of a plaintiff." *Hickey, supra* at 449.

evidence when appointing fault." *Ante* at 10-11. However, the majority opinion does not elaborate regarding what type of evidence may satisfy this standard. In my judgment, only where the defendant presents sufficient relevant evidence, which generally will be based on substantiated scientific or other documented, reliable, and verifiable findings, that a reasonable person could have foreseen that his injury and subsequent damages were the "natural and probable consequence" of his own conduct, will § 6304 require that the trier of fact determine whether such conduct "contributed" to the plaintiff's injury and subsequent damages, thereby offsetting to some degree the defendant's exclusive liability.[7]

Further, section 6304 does not require a trier of fact to consider *when* the fault occurred, but merely *whether* the fault was "a proximate cause of damage sustained by a party." That is, contrary to the beliefs of the trial court, Court of Appeals, and plaintiff, § 6304 does not apparently distinguish between a plaintiff's "pre-

---

[7] I believe that the burden is upon the defendant to present relevant evidence substantiated by either scientific or other documented, reliable, and verifiable findings demonstrating that the plaintiff's injury and damages were a genuinely foreseeable, natural, and probable consequence of the plaintiff's alleged negligence.

treatment" and "post-treatment" negligence by providing that only the latter may be considered in apportioning fault and determining damages. Rather, § 6304 specifically requires that a trier of fact be permitted to consider the negligence of "each plaintiff," be it pre-treatment or post-treatment negligence, if such negligence was "a proximate cause" of the plaintiff's injury and subsequent damages.[8]

Concern has been expressed at argument that, if a plaintiff's pre-treatment conduct may be considered under § 6304, this will enable a negligent doctor to avoid, at least in part, liability for his malpractice. For example, assume that a plaintiff, whose doctor has negligently failed to diagnosis her impending heart attack, files a medical malpractice action against the doctor on the basis

---

[8] "'The pre-treatment health habits of a patient' . . . 'are germane to the issue of proximate cause . . . .'" *Bryant v Calantone*, 286 NJ Super 362, 368; 669 A2d 286 (1996)(citations omitted). "This does not mean, however, that the patient's poor health is irrelevant to the analysis of a claim for reparation. While the doctor may well take the patient as she found her, she cannot reverse the frames to make it appear that she was presented with a robust vascular condition; likewise, the physician cannot be expected to provide a guarantee against a cardiovascular incident. All that the law expects is that she not mistreat such a patient so as to become a proximate contributing cause to the ultimate vascular injury." *Ostrowski v Azzara*, 111 NJ 429, 445; 545 A2d 148 (1988).

of such negligence. At trial, the defendant attempts to offset a portion of his fault by introducing evidence that the plaintiff herself was a proximate cause of her heart attack because she had eaten a bag of potato chips daily for the past twenty years. In my judgment, the plaintiff's injuries and subsequent damages in such a circumstance would be far "too insignificantly related to" and "too remotely affected" by such conduct, and thus wholly inadequate to establish "a proximate cause" relationship between the plaintiff's conduct and her injury and damages. See *Davis v Thornton*, 384 Mich 138, 145; 180 NW2d 11 (1970). It is simply not a foreseeable, natural, or probable consequence that such conduct will result in a heart attack. The instant case is clearly distinguishable because plaintiff here failed to regularly take medication that was prescribed by her doctor in order *precisely* to prevent the specific fatal injury that she suffered. That is, there is a far closer and more direct connection between plaintiff's negligent conduct and her injury, and thus I believe that such conduct may reasonably be considered by a trier of fact as "a proximate cause" of her injury and subsequent damages.

In summary, in a medical malpractice action in determining whether the plaintiff's own negligence has been

"a proximate cause" of her injury and damages, I believe that the trial court must ensure that the defendant has sustained its burden of proof in presenting relevant evidence, that such evidence is sustained by either scientific or other reliable and verifiable findings, and that such evidence demonstrates that the plaintiff's specific injury and damages were a genuinely foreseeable, natural, and probable consequence of her negligence. In cases such as this, in which a plaintiff's allegedly negligent conduct relates to a specific diagnosed condition, combined with a failure to comply with a doctor's prescribed regimen for that specific condition, I agree with the majority that a question of fact for the jury regarding whether plaintiff's own conduct constitutes a sufficiently "proximate cause" of her own injury has been presented. Because in most instances I do not believe that such matters bear a "proximate cause" relationship to injuries and damages suffered by a medical malpractice plaintiff, I do not view § 6304 as allowing defendants to speculate about, or to engage in generalized investigations concerning, a plaintiff's lifestyle, exercise habits, or diet.

## IV. Conclusion

Here, there was one indivisible injury, Shinholster's fatal stroke, allegedly caused by the separate, independent acts of Shinholster herself and defendants. Had the injury been caused by the separate, independent negligent acts of defendants and another tortfeasor, the liability of each would be determined by the fault attributable to each. See *Townsend, supra* at 279. Under § 6304, the principle is the same where evidence exists that the negligence of Shinholster herself was a proximate cause of her fatal stroke and subsequent damages. Further, because the jury in this case has already determined that defendants breached their standard of care, a determination that I note defendants have not appealed, I would reverse the judgment of the Court of Appeals and remand this case for calculation of damages only.

Stephen J. Markman

14

# S T A T E   O F   M I C H I G A N

## SUPREME COURT

ESTATE OF BETTY JEAN SHINHOLSTER,
Deceased, by JOHNNIE E. SHINHOLSTER,
Personal Representative,

    Plaintiff-Appellee,

v                                     No. 123720

ANNAPOLIS HOSPITAL, assumed name for
OAKWOOD UNITED HOSPITALS, INC.,

    Defendant-Appellant,

and

DENNIS ADAMS, M.D. AND MARY ELLEN
FLAHERTY, M.D.,

    Defendants.

_____

ESTATE OF BETTY JEAN SHINHOLSTER,
Deceased, by JOHNNIE E. SHINHOLSTER,
Personal Representative,

    Plaintiff-Appellee,

v                                     No. 123721

KATHERINE ADAMS, Personal Representative
Of the Estate of DENNIS ADAMS, M.D., and
MARY ELLEN FLAHERTY, M.D.,

    Defendants-Appellants,

and

ANNAPOLIS HOSPITAL, assumed name for
OAKWOOD UNITED HOSPITALS, INC.,

    Defendant.

_____

CORRIGAN, C.J. (*concurring in part and dissenting in part*).

Although I agree with the majority that the noneconomic damages cap found in MCL 600.1483 applies to wrongful death actions alleging malpractice and that a jury is permitted in all "personal injury, property damage, or wrongful death" tort actions to consider a plaintiff's pretreatment negligence as comparative negligence to offset a defendant's fault (provided evidence has been admitted that would allow a reasonable person to conclude such negligence was "a proximate cause" of the plaintiff's injury), I cannot join the majority's treatment of the remaining issues and respectfully dissent.

First, because defendants were precluded from submitting evidence that arguably would have allowed a reasonable person to find that Betty Shinholster's pretreatment negligence of failing to regularly take her prescribed blood pressure medication during the year preceding her fatal stroke was a proximate cause of her fatal stroke, I would reverse and remand for a new trial on all issues, rather than a trial on damages only.

I would further hold that the higher damages cap found in MCL 600.1483 does not apply to wrongful death actions alleging medical malpractice. MCL 600.1483(1) provides

2

that the lower cap applies *unless* one of the enumerated exceptions applies. Death is not an enumerated exception. This Court is not free to question the Legislature's policy choices; rather, the statutory language must be applied as written.

Finally, I would hold that the jury's award of future damages should have been reduced to present value pursuant to MCL 600.6306. MCL 600.6311 provides that the reduction to present value does not apply to "a plaintiff who is 60 years of age or older at the time of judgment." I believe that MCL 600.6311 cannot apply in wrongful death cases because, in such cases, the true "plaintiff" is the estate, which is not a person and does not have an "age."

## I. ANALYSIS

### A. A NEW TRIAL ON ALL ISSUES IS REQUIRED

Although I agree with the majority that decedent's pretreatment negligence is a matter properly submitted to the jury, I do not agree that the new trial should be limited to damages only. Because of the trial court's ruling that all decedent's pretreatment negligence could not be considered, defendants were limited to submitting evidence that decedent was comparatively negligent from April 7 onward, when she first visited the emergency room. Yet, it is apparent from that testimony that had a wider

3

scope of questioning been allowed, just as defendants' expert testimony supported the proposition that her failure for ten days (April 7 through April 16) to take her medications was a proximate cause,[1] it surely would have

---

[1] One of defendants' experts, Dr. Bradford Walters, testified as follows:

*Q.* Does Mrs. Shinholster have a duty to take her medication as prescribed?

*A.* She does.

* * *

*Q.* I want you to assume for this next question that as of April 7, 1995 and continuing through April 16th, 1995 when Mrs. Shinholster went into the hospital, I want you to assume that she did not take her Procardia as prescribed.

*A.* So assumed.

*Q.* I want you to assume she maintained her normal habit and routine regarding that, and she only took it when she didn't feel well[.]

*A:* I will assume that.

*Q.* Assuming that to be true, do you have an opinion based upon a reasonable degree of medical certainty that Mrs. Shinholster's failure to take the Procardia as prescribed from April 7 through April 16, 1995 was a proximate cause of her stroke and ultimate death?

*A.* I think it was one of the reasons, yes. It was a proximate cause.

*Q.* Why would her failure to take her medication as prescribed be a proximate cause of her stroke and death?

*A.* One of the worst things that can happen to a patient who has high blood pressure is to take their medication intermittently. The blood pressure comes down. The medication wears off. The blood pressure soars up. The blood pressure
                    (continued . . . .)

4

supported the same conclusion for a greater period-the previous year. Accordingly, the trial court clearly erred in precluding evidence made admissible by MCL 600.6304 and this prevented defendants from receiving a fair trial.[2]  MCR

---

(continued . . . .)
comes down.  If and when they take it again, it's sort [of] like a hammer hit to the brain each time that happens.

When blood pressure medications are taken on a regular basis there's a much smoother lowering of blood pressure and you don't get those spikes up and down and up and down.

Those spike[s] up and down can possibly cause what happened to Mrs. Shinholster and a stroke like this. . . .

* * *

*Q.* So one of the things you have [a] problem with Betty Shinholster is she must not have been taking her meds as prescribed.  Is that what you believe?

*A.*  That's what I believe.

*Q.*  Do you believe that caused her death?

*A.*  I believe it was one of several factors.  Whether I can say it is the cause, the ultimate cause, would be nice for black and white purposes.  But nothing is quite that black and white.  But I think it was one part of a jig saw puzzle, and that was definitely one piece.

*Q.*  Let me ask you this, sir: If she had taken her blood pressure medication exactly as the doctor told her to do you believe she would be alive?

*A.*  I think there was a good chance that she may have been.

[2] I further note that, although Justice MARKMAN argues, *ante* at 16 and n 11, that defendants have not argued that a
(continued . . . .)

(continued . . . .)

new trial on all issues is required, defendants have preserved this issue on appeal. Defendants preserved the issue at trial by objecting to the trial court's refusal to admit evidence regarding the decedent's pretreatment negligence. Defendants also objected to the trial court's modified jury instruction regarding the decedent's comparative negligence, arguing that the jury should have been able to consider all of the decedent's conduct.

On appeal, defendants again preserved the argument regarding liability and proximate cause. Issue I of defendants' brief argues that "defendants were denied a fair trial by the trial court's instruction on comparative negligence, which improperly restricted the jury's consideration and proper allocation of the decedent's comparative fault." Defendants argued that the trial court's limitation of evidence regarding the decedent's comparative negligence, and the resulting modified jury instruction, "denied [defendants'] right to have their responsibility determined in accordance with the facts and the law, and for this, they must be granted a new trial." Finally, defendants argued that defendants "presented expert testimony supporting their claim that [the decedent's] persistent failure or refusal to comply with [] clearly communicated medical advice was a proximate cause of [the decedent's] death. The trial court's instruction, however, prevented the Jury from considering this negligence on [the decedent's] part as a cause of her injury."

On appeal to this Court, defendants also argued that a new trial was required because the trial court improperly limited evidence of comparative negligence, thus precluding the jury from considering all evidence regarding proximate cause:

> The jury should have been allowed to consider whether the injury was proximately caused by the separate, independent act of the plaintiff's decedent . . . . If the stroke was caused by the separate and independent negligent acts of these doctors or even another tortfeasor . . . , the liability of each would be determined by the fault attributed to each. . . .
>
> (continued . . . .)

6

2.611(A)(1)(a). New trials limited only to damage issues are disfavored. See *Burns v Detroit*, 468 Mich 881; 658 NW2d 468 (2003); *Garrigan v LaSalle Coca-Cola Bottling Co*, 373 Mich 485, 489; 185 NW2d 97 (1964).

More importantly, the jury must make a determination of *liability* (including comparative fault), taking into account the improperly excluded evidence; thus, a new trial limited to damages only would not be appropriate. Whether defendants contested the jury's finding that the standard of care was breached is irrelevant. In order to establish a prima facie case, plaintiff must prove: (1) a breach of the standard of medical care; (2) injury; (3) proximate cause—a definitive legally recognized linkage between the

_____

(continued . . . .)

\* \* \*

Based on the evidence that was presented, and further evidence that could have been presented, it can only be concluded that a jury could have found that the decedent was negligent prior to April 7, 1995 and that such negligence was a cause of the fatal stroke. The trial court's limitation on the admission of evidence and its instructions to the jury were erroneous and inconsistent with substantial justice and not harmless error.

Thus, defendants have preserved the argument that a new trial on all issues is required because the proximate cause issue affects liability, as well as the argument that, in the alternative, their damages should be reduced.

7

breach and the injury; and (4) damages. *Cox v Flint Bd of Hosp Managers*, 467 Mich 1, 10; 651 NW2d 356 (2002). Simply proving that there was a breach of the standard of care, without more, does not prove liability. A breach of the standard of care is only relevant if the trier of fact determines that that breach is a *proximate cause* of the plaintiff's injury. It is entirely possible for a defendant to admit negligence and still argue there is no liability because the negligence was not the proximate cause of the injury. Here, defendants were precluded from offering evidence that any breach of the standard of care was not the proximate cause of the decedent's injury, given her pretreatment negligence. Had the evidence been presented, the jury could reasonably have concluded that even if defendants had breached the standard of care, they still were not liable because any breach was not a proximate cause of the decedent's injuries. Therefore, a new trial on all issues, including liability, is necessary. Limiting the new trial to damages only ignores the important fact that proximate cause is essential to a plaintiff's prima facie case, and improperly conflates two separate and necessary elements of liability: of a breach

of a standard of care *and* a showing that that breach was a proximate cause of the injury.[3]

In fact, under our statutory scheme, the issues of liability and damages, as they relate to comparative negligence, are inextricably linked. MCL 600.2959 provides:

---

[3] In fact, this view is supported by the standard jury instruction regarding the burden of proof for malpractice cases. M Civ JI 30.03 provides:

> The plaintiff has the burden of proof on each of the following:
>
> a. that the defendant was professionally negligent in one or more of the ways claimed by the plaintiff as stated in these instructions
>
> b. that the plaintiff sustained injury and damages
>
> c. that the professional negligence or malpractice of the defendant *was a proximate cause of the injury* and damages to the plaintiff
>
> Your verdict will be for the plaintiff if the defendant was negligent, *and such negligence was a proximate cause of the plaintiff's injuries*, and if there were damages.
>
> Your verdict will be for the defendant if the defendant was not professionally negligent or did not commit malpractice, or if the defendant was professionally negligent or did commit malpractice *but such professional negligence or malpractice was not a proximate cause of the plaintiff's injuries* or damages, or if the plaintiff was not injured or damaged. [Emphasis added.]

9

> In an action *based on tort* or another legal theory seeking damages for personal injury, property damage, *or wrongful death*, the court shall reduce the damages by the percentage of comparative fault of the person upon whose injury or death the damages are based as provided in section 6306. *If that person's percentage of fault is greater than the aggregate fault of the other person or persons*, whether or not parties to the action, the court shall reduce economic damages by the percentage of comparative fault of the person upon whose injury or death the damages are based as provided in section 6306, *and noneconomic damages shall not be awarded.* [Emphasis added.]

In addition, M Civ JI 11.01, the standard jury instruction regarding comparative negligence, provides:

> The total amount of damages that the plaintiff would otherwise be entitled to recover shall be reduced by the percentage of plaintiff's negligence that contributed as a proximate cause to [*his/her*] [*injury/property damage.*]

> This is known as comparative negligence.

> (The plaintiff, however, is not entitled to noneconomic damages if [*he/ she*] is more than 50 percent at fault for [*his/ her*] injury.)

In other words, the standard jury instruction simply reduces MCL 600.2959 to its mathematical equivalent: in order for the plaintiff or the decedent's fault to be more than the aggregate sum of the fault of all other applicable persons, the jury must place the plaintiff's fault at more than fifty percent.

Thus, both MCL 600.2959 and M Civ JI 11.01 assume that the jury has properly heard all evidence regarding

10

liability and reached a determination of fault before damages can be assessed.  If, during the trial, the jury was improperly precluded from considering evidence regarding the decedent's comparative negligence, it follows that the jury's determination of liability is flawed.  If this determination of liability is flawed, it is impossible to ascertain the correct amount of damages.  Therefore, I do not believe that it is possible to separate the issues of liability and damages, and believe a new trial on all issues is required.  I would reverse the judgment of the Court of Appeals and remand this case for a new trial.

### B.  THE LOWER DAMAGES CAP APPLIES

For the reasons stated in *Jenkins v Patel*, 471 Mich ____; ___ NW2d ___ (2004), I agree with the majority that the noneconomic damages cap found in MCL 600.1483 applies to wrongful death actions alleging medical malpractice.  I cannot agree, however, that the higher tier of the damages cap applies to such cases.  Instead, I would hold that the lower tier applies to wrongful death actions alleging medical malpractice.

MCL 600.1483(1) provides:

> In an action for damages alleging medical malpractice by or against a person or party, the total amount of damages for noneconomic loss recoverable by all plaintiffs, resulting from the negligence of all defendants, shall not exceed

11

$280,000.00 unless, as the result of the negligence of 1 or more of the defendants, 1 or more of the following exceptions *apply as determined by the court pursuant to section 6304*, in which case damages for noneconomic loss shall not exceed $500,000.00:

(a) The plaintiff *is* hemiplegic, paraplegic, or quadriplegic resulting in a total permanent functional loss of 1 or more limbs caused by 1 or more of the following:

(i) Injury to the brain.

(ii) Injury to the spinal cord.

(b) The plaintiff *has* permanently impaired cognitive capacity rendering him or her incapable of making independent, responsible life decisions and permanently incapable of independently performing the activities of normal, daily living.

(c) There *has been* permanent loss of or damage to a reproductive organ resulting in the inability to procreate. [Emphasis added.][4]

---

[4] In the former version of § 1483, a one-tiered cap included "death" as an exception to the then-$225,000 cap:

(1) In an action for damages alleging medical malpractice against a person or party specified in section 5838a, damages for noneconomic loss which exceeds $225,000.00 shall not be awarded unless 1 or more of the following circumstances exist:

(a) There has been a death.

(b) There has been an intentional tort.

(c) A foreign object was wrongfully left in the body of the patient.

(d) The injury involves the reproductive system of the patient.

(continued . . . .)

12

As an initial matter, MCL 600.1483(1) requires the *trial court* to determine whether one of the statutory exceptions, and thereby the higher cap, applies. Here, however, the *jury* was improperly instructed to return a special verdict that required answers to the following questions: "Did [the decedent] suffer hemiplegia, paraplegia, or quadriplegia resulting in a total or permanent functional loss of one or more limbs caused by injury to the brain?" and "Did [the decedent] suffer permanently impaired cognitive capacity rendering her incapable of making independent, responsible life decisions and permanently incapable of independently performing the activities of normal, daily living?" The jury answered "yes" to both questions, and the trial court determined that the higher, $500,000 cap was therefore applicable.

These questions should not have been submitted to the jury because the applicability of § 1483 is a question for

_____

(continued . . . .)

> (e) The discovery of the existence of the claim was prevented by the fraudulent conduct of a health care provider.
>
> (f) A limb or organ of the patient was wrongfully removed.
>
> (g) The patient has lost a vital bodily function. [1986 PA 178, effective October 1, 1986.]

13

the court. I would, therefore, take this opportunity to clarify that the question of the application of § 1483 is solely an issue for the trial court, not the jury.

Further, I believe that the lower tier damages cap of § 1483 applies in wrongful death actions alleging malpractice. In any wrongful death action, the plaintiff is seeking to recover for the decedent's *death*, and death is not one of the statutory exceptions giving rise to the application of the higher cap. This Court does not have the authority to create an exception the Legislature has not included in the statute. Had the Legislature wished to include negligence causing death as an exception, it could have done so.

In fact, it *did* do so in the previous version of the statute, but this death exception was eliminated when the statute was amended in 1993 to its current form. 1993 PA 78, effective October 1, 1993. The history of the current version of § 1483 indicates that the Legislature intended to exclude death from the exceptions giving rise to the application of the higher cap. Although death was one of the exceptions enumerated in the prior version of the statute, it is conspicuously absent from the present version of the statute. The Legislature apparently made a policy decision that the survivors of dead medical

14

malpractice victims are entitled to lesser damages than are living medical malpractice victims who are suffering from one of the three types of permanent conditions enumerated in the statute. This choice makes sense because it is not the surviving, permanently, and severely injured patient who is recovering damages in a wrongful death action, but the patient's relatives or other survivors who have not suffered from these permanent conditions. Further, in enacting this aspect of tort reform legislation, the Legislature could well have chosen a policy that would help to limit the cost of malpractice insurance. Whether one agrees with such policy decisions, those decisions are solely within the Legislature's authority to make. This Court may not question the wisdom of the Legislature's policy choices; rather, this Court must enforce the statutory language as written.

Finally, the structure of § 1483(1) indicates that the Legislature intended that an exception, if it is applicable, apply *at the time* that the trial court makes its postverdict determination concerning whether the cap requires adjustment of the verdict. First, § 1483(1) imposes the $280,000 cap unless "1 or more of the . . . exceptions *apply* as determined by the court pursuant to section 6304 . . . ." Section 6304(5), in turn, directs

the trial court to "reduce an award of damages" as required by the limitations set forth in § 1483(1). This language supports the conclusion that the exception must be applicable at the time the verdict is adjusted by the trial court. Second, the language of subsections 1(a) and (b) of the cap statute, § 1483, is in the present tense ("[t]he plaintiff *is* hemiplegic"; "[t]he plaintiff *has* permanently impaired cognitive capacity"), clearly requiring that the enumerated conditions *currently* exist. Here, at the time of the postverdict decision regarding the amount recoverable, the decedent would not have been described as someone who was paraplegic or someone who had a permanently impaired cognitive capacity; rather, the decedent would have only been described as deceased.

For the same reasons stated in *Jenkins*, *supra* at ___, applying the lower damages cap does not frustrate the purpose of MCL 600.2922(6), which provides that the court or jury in a wrongful death action "may *award* . . . reasonable compensation for the pain and suffering, while conscious, undergone by the deceased person during the period intervening between the time of the injury and death . . . ." (Emphasis added.) As we noted in *Jenkins*, applying the lower damages cap to limit the amount of actual *recovery* by the plaintiff does not in any way limit

16

the amount of the jury's *award*. The jury or court may still award whatever amount it concludes is reasonable under MCL 600.2922(6); that amount, however, is subject to reduction under MCL 600.1483.

Therefore, because MCL 600.1483 does not include death as one of the enumerated exceptions to the lower damages cap, and because the statutory syntax suggests that the plaintiff must currently fall into one of the enumerated exceptions at the time of the postverdict recovery determination, I believe that the lower tier damages cap applies in wrongful death actions alleging medical malpractice.

C. MCL 600.6311 DOES NOT APPLY TO WRONGFUL DEATH ACTIONS

MCL 600.6306 provides, in relevant part:

(1) After a verdict rendered by a trier of fact in favor of a plaintiff, an order of judgment shall be entered by the court. Subject to section 2959, the order of judgment shall be entered against each defendant, including a third-party defendant, in the following order and in the following judgment amounts:

* * *

(c) All future economic damages, less medical and other health care costs, and less collateral source payments determined to be collectible under section 6303(5) reduced to gross present cash value.

(d) All future medical and other health care costs reduced to gross present cash value.

>(e) All future noneconomic damages reduced to gross present cash value.

>\* \* \*

>(2) As used in this section, "gross present cash value" means the total amount of future damages reduced to present value at a rate of 5% per year for each year in which those damages accrue, as found by the trier of fact as provided in section 6305(1)(b).

MCL 600.6311, however, provides an exception to the requirement in MCL 600.6306 of a reduction to present value:

>Sections 6306(1)(c), (d), and (e), 6307, and 6309 do not apply to a plaintiff who is 60 years of age or older at the time of judgment.

Here, the trial court ruled that in wrongful death cases, the "plaintiff" referred to in § 6311 was the decedent. Because the decedent was over age sixty at the time of judgment, the trial court held that § 6311 applied. The Court of Appeals declined to determine whether § 6311 applied to the decedent or to the personal representative because both the decedent and the personal representative were over age sixty; therefore, the Court held that § 6311 applied in any event.

I believe that the exception does not apply in the case of a decedent: it applies only to a plaintiff who "*is* 60 years of age or older at the time of judgment." At the time of judgment in a wrongful death action, the decedent

18

is dead. Moreover, the decedent is not generally recognized as the "plaintiff" in a wrongful death action.

At common law, a cause of action did not survive death. As we noted in *Hawkins v Regional Medical Laboratories, PC*, 415 Mich 420, 428-429; 329 NW2d 729 (1982), "under common law, [causes of action] were terminated by the death either of the person injured or the tortfeasor. 1846 Rev Stats, ch 101, § 5." The Legislature subsequently changed the common-law rule through the wrongful death provisions, allowing causes of actions to survive death through the creation of a "new" plaintiff, the estate. The estate is then represented by the personal representative: MCL 600.2922(2) provides that "[e]very action under this section [the wrongful death provision] *shall be brought by, and in the name of, the personal representative of the estate of the deceased person.*" Indeed, the named plaintiff in the instant case is "Estate of Betty Jean Shinholster," "*by*" the personal representative.

Section 2922(2) does not compel the conclusion that the "plaintiff" in a wrongful death action is the personal representative. Rather, § 2922(2) simply requires that the action be brought "by" and "in the name of" that representative. The true plaintiff remains the decedent's

19

estate. Those who are entitled to share in the proceeds of a judgment obtained in the wrongful death action are enumerated in MCL 600.2922(3), and include relatives, a spouse's children, and devisees and beneficiaries. These persons can be relevant only because they all may be entitled to a portion of the decedent's *estate*. Unlike a living person, an estate does not have an "age"; therefore, § 6311 cannot apply to an estate. Because § 6311 does not apply to estates, it cannot be applied in wrongful death actions.

## II.  CONCLUSION

I agree with the majority that the clear and unambiguous language of MCL 600.6304(1) and MCL 600.2959 requires that a jury is permitted in all medical malpractice actions to consider a plaintiff's pretreatment negligence as comparative negligence to offset a defendant's fault, provided evidence has been admitted that would allow a reasonable person to conclude such negligence was "a proximate cause" of the plaintiff's injury. I do not agree, however, that a new trial should be limited to damages only; rather, I would reverse and remand for a new trial on all issues.

Further, although I agree that the noneconomic damages cap of MCL 600.1483 applies to wrongful death actions

20

alleging medical malpractice, I do not agree that the higher tier applies in such cases. Instead, I would hold that the lower cap of MCL 600.1483(1) applies.

Finally, I would hold that MCL 600.6311, which provides that the reduction to present value does not apply to "a plaintiff who is 60 years of age or older at the time of judgment," cannot apply in wrongful death cases, because in such cases the true "plaintiff" is the estate, which is not a person and does not have an "age."

Therefore, I would reverse the decision of the Court of Appeals and remand for a new trial.

Maura D. Corrigan
Clifford W. Taylor
Robert P. Young, Jr.

21

# S T A T E   O F   M I C H I G A N

## SUPREME COURT

ESTATE OF BETTY JEAN SHINHOLSTER,
Deceased, by JOHNNIE E. SHINHOLSTER,
Personal Representative,

    Plaintiff-Appellee,

v                              No. 123720

ANNAPOLIS HOSPITAL, assumed name for,
OAKWOOD UNITED HOSPITALS, INC.,

    Defendant-Appellant,

and

DENNIS ADAMS, M.D. AND MARY ELLEN
FLAHERTY, M.D.,

    Defendants.

_____

ESTATE OF BETTY JEAN SHINHOLSTER,
Deceased, by JOHNNIE E. SHINHOLSTER,
Personal Representative,

    Plaintiff-Appellee,

v                              No. 123721

KATHERINE ADAMS, Personal Representative
of the Estate of DENNIS ADAMS, M.D., and
MARY ELLEN FLAHERTY, M.D.,

    Defendants-Appellants,

and

ANNAPOLIS HOSPITAL, assumed name for,
OAKWOOD UNITED HOSPITALS, INC.,

    Defendant.

_____

CAVANAGH, J. (*concurring in part and dissenting in part*).

I agree with the majority that MCL 600.6311 applies in this case and join that portion of the lead opinion in full.  With respect to the applicability of the medical malpractice noneconomic damages cap, I concur only in the result because I remain committed to my position in *Jenkins v Patel*, 471 Mich ___; ___ NW2d ___ (2004).  And finally, I must respectfully dissent from the majority's decision allowing the trier of fact to consider plaintiff's alleged pretreatment negligence.  I agree with the trial court and the Court of Appeals, as well as the Restatement and a majority of other jurisdictions, that it would be improper for the jury to consider plaintiff's pretreatment negligence.  Thus, I would affirm the decision of the Court of Appeals.

Today, a plurality of this Court makes a mockery of tort law by holding that a jury can consider a plaintiff's pretreatment negligence to determine liability.  Justice Markman's approach, allowing the jury to consider plaintiff's pretreatment negligence only when determining damages, is also contrary to general tort principles.  While Justice Markman claims that allowing the jury to consider a plaintiff's pretreatment negligence in a medical

2

malpractice action is consistent with prior law, *ante* at 5 n 3, a close reading of this Court's precedent shows that it does not support Justice Markman's argument. Make no mistake, allowing a jury to consider a plaintiff's pretreatment negligence in a medical malpractice action is a sweeping new decision, with no basis in this Court's prior rulings.

It is an axiom of tort law that the defendant takes the plaintiff as he finds her. *Wilkinson v Lee*, 463 Mich 388, 396; 617 NW2d 305 (2000). Potentially eviscerating a defendant's liability or reducing a plaintiff's damages on the basis of a condition that a plaintiff brings to the table ignores this foundational principle of tort law. It also opens the door to scrutiny of a medical malpractice plaintiff's pretreatment health habits and lifestyle in nearly every medical malpractice action. "[W]hatever the wisdom or folly of our lifestyles, society, through its laws, has not yet imposed a normative life-style on its members." *Ostrowski v Azzara*, 111 NJ 429, 444; 545 A2d 148 (1988). Today's majority imposes a judicially created normative lifestyle on the citizens of this state.

The majority also subverts the text of MCL 600.6304 when it holds that § 6304 requires the trier of fact to determine the comparative negligence of all who are a

3

proximate cause of the plaintiff's *injury*.  The statute actually states:  "'fault' includes an act . . . that is a proximate cause of *damage* sustained by a party."  MCL 600.6304(8) (emphasis added).  While the majority focuses on plaintiff's injury, its attention would be more properly focused on the plaintiff's damage.

The plaintiff's damage in a medical malpractice action is determined by the difference between the decedent's hypothetical life without the negligence of the doctor and the actual result.  In this case, the damage plaintiff claims is the difference between the life of a woman who suffered a mini-stroke that was properly treated and a dead woman.  The majority potentially eliminates all doctors' liability for all negligent behavior by mischaracterizing the damage.  It is absurd to assert that plaintiff's pretreatment behavior can be considered the proximate cause of the damage inflicted by the doctor's malpractice.

"As a general rule, negligence by a patient that occurred before the malpractice and provided the occasion for the treatment that is the subject of the malpractice claim cannot give rise to a defense of comparative negligence."  Moore & Gaier, *A Plaintiff's Culpable Conduct*, NY Law J 3 (Mar 3, 1998).  Comment m to Restatement Torts, 3d, Apportionment of Liability, § 7,

provides that the jury in a medical malpractice action cannot consider the plaintiff's conduct that created the condition that the doctor was employed to remedy.  So, in this case, the trial court was correct to prevent the jury from considering plaintiff's failure to regularly take her medication.

In addition to the Restatement, I am persuaded by the wealth of authority from other jurisdictions that have refused to allow juries to consider a plaintiff's pretreatment negligence in medical malpractice actions. For example, the Florida Court of Appeals, in *Matthews v Williford*, 318 So 2d 480, 483 (1975), persuasively held that "conduct of a patient which may have contributed to his illness or medical condition . . . simply is not available as a defense to malpractice which causes a distinct subsequent injury . . . ."  See, also, *Mercer v Vanderbilt Univ, Inc*, 134 SW3d 121, 129-130 (Tenn, 2004); *DeMoss v Hamilton*, 644 NW2d 302, 306-307 (Iowa, 2002); *Harding v Deiss*, 300 Mont 312, 318; 3 P3d 1286 (2000); *Smith v Kennedy*, 2000 US Dist LEXIS 9897, 11-12 (D Kan, 2000); *Harvey v Mid-Coast Hosp*, 36 F Supp 2d 32, 37-38 (D Me, 1999); *Durphy v Kaiser Foundation Health Plan of Mid-Atlantic States, Inc*, 698 A2d 459, 465-467 (DC App, 1997); *Fritts v McKinne*, 934 P2d 371, 374 (Okla Civ App, 1996);

*Spence v Aspen Skiing Co*, 820 F Supp 542, 544 (D Colo, 1993); *Van Vacter v Hierholzer*, 865 SW2d 355, 359 (Mo App, 1993); *Martin v Reed*, 200 Ga App 775, 777; 409 SE2d 874 (1991); *Jensen v Archbishop Bergan Mercy Hosp*, 236 Neb 1, 15; 459 NW2d 178 (1990); *Cowan v Doering*, 215 NJ Super 484, 495; 522 A2d 444 (1987); *Owens v Stokoe*, 115 Ill 2d 177, 183; 503 NE2d 251 (1986).

Justice Markman attempts to make a distinction between a distinct subsequent injury and an injury that would be part of the "natural and foreseeable result of the plaintiff's original negligence." *Ante* at 3 n 9. This distinction, however, is a distinction without a difference when examining the proper damage in a medical malpractice action. Because a tortfeasor must take a plaintiff as he finds her, the plaintiff in Justice Markman's examples would be taken as a plaintiff with a broken leg. Without the negligence of the doctor, a plaintiff with a broken leg could expect full recovery. Regardless of whether the doctor's negligence results in death or in a poorly set leg, the damage in the case is the difference between the expected full recovery and the actual result. In neither example, can the plaintiff's negligence in breaking her leg be a proximate cause of the damage.

6

Because the majority mischaracterizes the damage and allows the jury to consider plaintiff's pretreatment negligence, I must respectfully dissent. I refuse to take part in the judicial determination of what is and is not socially acceptable behavior. Smokers, couch potatoes, and fast food connoisseurs pick your doctors carefully because after today, no matter how negligent a doctor is in treating you, the jury will be able to consider your poor health habits when deciding whether to hold the doctor liable. I would affirm the holding of the trial court and the Court of Appeals.

Michael F. Cavanagh
Marilyn Kelly

**S T A T E   O F   M I C H I G A N**

**SUPREME COURT**

ESTATE OF BETTY JEAN SHINHOLSTER,
Deceased, by JOHNNIE E. SHINHOLSTER,
Personal Representative,

    Plaintiff-Appellee,

v                                             No. 123720

ANNAPOLIS HOSPITAL, assumed name for
OAKWOOD UNITED HOSPITALS, INC.,

    Defendant-Appellant,

and

DENNIS ADAMS, M.D. AND MARY ELLEN
FLAHERTY, M.D.,

    Defendants.

_____

ESTATE OF BETTY JEAN SHINHOLSTER,
Deceased, by JOHNNIE E. SHINHOLSTER,
Personal Representative,

    Plaintiff-Appellee,

v                                             No. 123721

KATHERINE ADAMS, Personal Representative
Of the Estate of DENNIS ADAMS, M.D., and
MARY ELLEN FLAHERTY, M.D.,

    Defendants-Appellants,

and

ANNAPOLIS HOSPITAL, assumed name for
OAKWOOD UNITED HOSPITALS, INC.,

    Defendant.

_____

**WEAVER, J.** (*concurring in part and dissenting in part*).

I

I dissent from the majority's holding that pursuant to MCL 600.6304, plaintiff's pretreatment negligence may be considered by the jury in assessing comparative negligence because it may have been a proximate cause of plaintiff's death. *Ante* at 2-3.[1] I agree with Justice Cavanagh's concurring and dissenting opinion that it would be improper for the jury to consider plaintiff's pretreatment negligence to determine comparative negligence, *ante* at 2, and I would affirm the Court of Appeals decision on this point.

To determine the comparative negligence of the parties, MCL 600.6304 provides that the trier of fact in a tort action shall determine the percentage of the total fault of all persons that contributed to the death or injury, including each plaintiff. MCL 600.6304(8) defines

_____

[1] The plaintiff's negligence *after* seeking treatment is not at issue in this case; the parties agree that a plaintiff's negligence *after* seeking treatment may be considered in a comparative negligence analysis. See *Pietrzyk v Detroit,* 123 Mich App 244, 248-249; 333 NW2d 236 (1983), and *Jalaba v Borovoy,* 206 Mich App 17, 23; 520 NW2d 349 (1994). The issue here focuses solely on plaintiff's conduct *before* seeking treatment.

2

"fault" as "an act, an omission, conduct . . . that is a *proximate cause of damage* sustained by a party." (Emphasis added.)

As Justice Cavanagh explains, the proper focus of the statute is on the plaintiff's damage, not the plaintiff's injury, and "[t]he plaintiff's damage in a medical malpractice action is determined by the difference between the decedent's hypothetical life without the negligence of the doctor and the actual result." *Ante* at 4.[2]

Further, I would hold that the plaintiff's pretreatment negligence did not fall within MCL 600.6304's definition of "fault" for the purposes of comparative negligence. While plaintiff's pretreatment negligence caused the need for care or treatment that led to the alleged medical malpractice, the plaintiff's pretreatment negligence was not a *proximate cause* of plaintiff's damages.

---

[2] It should be noted that plaintiff's pretreatment conduct and general health will be considered when the jury determines the *amount* of plaintiff's damages. For example, in this case, the jury found that decedent had a life expectancy of eight years, rather than the 15.44-year life expectancy provided by the mortality tables for a sixty-one-year-old woman in good health, or the ten to fifteen-year life expectancy that plaintiff's expert opined.

Proximate cause, or legal cause, as it is also known, involves examining the foreseeability of consequences, and considering whether a defendant should be held legally responsible for such consequences. *Skinner v Square D Co,* 445 Mich 153, 163-164; 516 NW2d 475 (1994). Deciding proximate cause is a policy determination of the courts:

> "Proximate cause"—in itself an unfortunate term—is merely the limitation which the courts have placed upon the actor's responsibility for the consequences of the actor's conduct. In a philosophical sense, the consequences of an act go forward to eternity, and the causes of an event go back to the dawn of human events, and beyond. But any attempt to impose responsibility upon such a basis would result in infinite liability for all wrongful acts, and would "set society on edge and fill the courts with endless litigation. As a practical matter, legal responsibility must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability. Some boundary must be set to liability for the consequences of any act, upon the basis of some social idea of justice or policy. [Prosser & Keeton, Torts (5th ed), § 41, p 264.]

To be allocated as "fault" for the purposes of comparative negligence under MCL 600.6304, a plaintiff's negligence must be a *proximate cause* of the plaintiff's damages. The majority does not offer any analysis regarding *why* it is appropriate to consider plaintiff's pretreatment negligence as a proximate cause of her death, but simply states that it may be considered.

4

I note that all the other state courts that have considered the question whether a patient's own pretreatment negligence could be considered a proximate cause of the patient's damages for purposes of comparative negligence have ultimately decided that it should not.[3] *Owens v Stokoe,* 115 Ill 2d 177, 183; 503 NE2d 251 (1987) (dental patient's failure to obtain second option, prior poor oral hygiene, and alleged refusal to permit X-ray to be taken of his teeth were insufficient to raise issue of contributory negligence because parasthesia was proximately caused by damage to the left interior alveolar nerve during surgery and conduct of patient did not prevent surgeon from properly performing surgery); *Eiss v Lillis,* 233 Va 545, 553-554; 357 SE2d 539 (1987) (the plaintiff's negligently taking aspirin along with heart medicine before the physician's alleged negligence was not a proximate cause of

---

[3] Although in 1996 the Tennessee Supreme Court held that a decedent's negligence in causing the initial injury would be considered in apportioning fault for the purposes of comparative negligence, *Gray v Ford Motor Co,* 914 SW2d 464, 467 (Tenn, 1996), that case was overruled in May of 2004, by *Mercer v Vanderbilt Univ, Inc,* 134 SW3d 121, 125 (Tenn, 2004). In *Mercer* the court held that "a patient's negligent conduct that occurs prior to a health care provider's negligent treatment and provides only the occasion for the health care provider's subsequent negligence may not be compared to the negligence of the health care provider." *Id.* at 130.

5

the plaintiff's death); *Jensen v Archbishop Bergan Mercy Hosp,* 236 Neb 1, 15-16; 459 NW2d 178 (1990) (although the plaintiff's failure to lose weight may have been causally related to his injury, his conduct regarding his weight problem merely furnished an occasion or condition for the medical care that was the basis of the medical malpractice action, and it was improper to instruct the jury to consider whether the plaintiff had been contributorily negligent); *Harding v Deiss,* 300 Mont 312, 318; 3 P3d 1286 (2000) (the plaintiff's negligence in riding a horse when she had asthma and was allergic to horses could not be compared to physician's failure to immediately intubate her upon her arrival at the hospital); *DeMoss v Hamilton,* 644 NW2d 302, 307 (Iowa, 2002) (the plaintiff's failure to stop smoking, have regular follow-up examinations, lose weight, and begin an exercise program after a heart attack provided the occasion for medical treatment, but was irrelevant to the question of defendant's medical negligence). See also *Harvey v Mid-Coast Hosp*, 36 F Supp 2d 32, 37-38 (D Me, 1999), *Spence v Aspen Skiing Co*, 820 F Supp 542, 544 (D Colo, 1993), *Van Vacter v Hierholzer*, 865 SW2d 355, 359 (Mo

App, 1993), and *Nelson v McCreary,* 694 A2d 897 (DC App, 1997).[4]

In holding that plaintiff's pretreatment negligence may be considered a proximate cause of plaintiff's damages for purposes of comparative negligence, the majority abandons the long-standing principle of tort law that the defendant takes the plaintiff as he finds her. See 2 Restatement Torts, 2d,§ 461, p 502; *Rawlings v Clyde Plank & Macadamized Rd Co,* 158 Mich 143, 146; 122 NW 504 (1909). As recently as 2000 this Court, including the majority, recognized and applied this principle of law. *Wilkinson v Lee,* 463 Mich 388, 396; 617 NW2d 305 (2000). The patient's conduct before seeking medical treatment is merely a factor the physician should consider in treating the patient. *Harding, supra* at 318. Rather than retreating from such a long-established principle, I would affirm the Court of Appeals on this issue.

II

I join in full § III(B) of the lead opinion, recognizing that the medical malpractice noneconomic damages cap of MCL 600.1483 applies to a wrongful death

---

[4]But see, contra, *Wyatt v United States,* 939 F Supp 1402 (ED Mo, 1996).

action based on an underlying claim of medical malpractice and concluding that the higher cap of MCL 600.1483 applies when the injured person, at any time while still living and as a result of a defendant's negligent conduct, fits with the ambit of MCL 600.1483(1).[5]

---

[5] MCL 600.1483 provides:

(1) In an action for damages alleging medical malpractice by or against a person or party, the total amount of damages for noneconomic loss recoverable by all plaintiffs, resulting from the negligence of all defendants, shall not exceed $280,000.00 unless, as the result of the negligence of 1 or more of the defendants, 1 or more of the following exceptions apply as determined by the court pursuant to section 6304, in which case damages for noneconomic loss shall not exceed $500,000.00:

(a) The plaintiff is hemiplegic, paraplegic, or quadriplegic resulting in a total permanent functional loss of 1 or more limbs caused by 1 or more of the following:

(i) Injury to the brain.

(ii) Injury to the spinal cord.

(b) The plaintiff has permanently impaired cognitive capacity rendering him or her incapable of making independent, responsible life decisions and permanently incapable of independently performing the activities of normal, daily living.

(c) There has been permanent loss of or damage to a reproductive organ resulting in the inability to procreate.

(2) In awarding damages in an action alleging medical malpractice, the trier of fact

(continued . . . .)

8

III

I also join in full § III(C) of the lead opinion, concluding that because the term "plaintiff," as used in MCL 600.6311, refers, for purposes of a wrongful death action, to the decedent, and because Mrs. Shinholster, the decedent, was sixty-one years old at her death and at the time of judgment, the damages awarded to plaintiff should not be reduced to their present value.[6]

IV

Because I would hold that the plaintiff's pretreatment negligence in this medical malpractice action did not fall

_____

(continued . . . .)
shall itemize damages into damages for economic loss and damages for noneconomic loss.

(3) As used in this section, "noneconomic loss" means damages or loss due to pain, suffering, inconvenience, physical impairment, physical disfigurement, or other noneconomic loss.

(4) The state treasurer shall adjust the limitation on damages for noneconomic loss set forth in subsection (1) by an amount determined by the state treasurer at the end of each calendar year to reflect the cumulative annual percentage change in the consumer price index. As used in this subsection, "consumer price index" means the most comprehensive index of consumer prices available for this state from the bureau of labor statistics of the United States department of labor.

[6] MCL 600.6311 provides: "Sections 6306(1)(c), (d), and (e), 6307, and 6309 do not apply to a plaintiff who is 60 years of age or older at the time of judgment."

9

within MCL 600.6304's definition of "fault," and therefore could not be considered for the purposes of comparative negligence, I would affirm the Court of Appeals on all counts.

Elizabeth A. Weaver

KELLY, J.

I concur with respect to sections I, III, and IV.

Marilyn Kelly

ESTATE OF BETTY JEAN SHINHOLSTER,
Deceased, by JOHNNIE E. SHINHOLSTER,
Personal Representative,

    Plaintiff-Appellee,

v                                  No. 123720

ANNAPOLIS HOSPITAL, assumed name for,
OAKWOOD UNITED HOSPITALS, INC.,

    Defendant-Appellant,

and

DENNIS ADAMS, M.D. AND MARY ELLEN
FLAHERTY, M.D.,

    Defendants.

_____

ESTATE OF BETTY JEAN SHINHOLSTER,
Deceased, by JOHNNIE E. SHINHOLSTER,
Personal Representative,

    Plaintiff-Appellee,

v                                  No. 123721

KATHERINE ADAMS, Personal Representative
of the Estate of DENNIS ADAMS, M.D., and
MARY ELLEN FLAHERTY, M.D.,

    Defendants-Appellants,

and

ANNAPOLIS HOSPITAL, assumed name for,
OAKWOOD UNITED HOSPITALS, INC.,

    Defendant.

_____

KELLY, J. (*concurring in part and dissenting in part*).

I fully agree with Justice Cavanagh's opinion. In addition, I join sections I, III, and IV of Justice Weaver's opinion.

Marilyn Kelly